## IN RE ANTONY B. ET AL.*
## (AC 18639)

Landau, Schaller and Daly, Js.

Argued February 16—officially released August 17, 1999

---

\* In accordance with the spirit and intent of General Statutes § 46b-142 (b) and Practice Book § 79-3, the names of the parties involved in this appeal are not disclosed. The records and papers of this case shall be open for inspection only to persons having a proper interest therein and upon order of the Appellate Court.

*David Brian Carr*, for the appellant (respondent mother).

*Donald R. Green*, assistant attorney general, with whom, on the brief, were *Richard Blumenthal*, attorney general, and *Benjamin Zivyon* and *Susan T. Pearlman*, assistant attorneys general, for the appellee (petitioner).

*Opinion*

SCHALLER, J. The respondent mother[1] appeals from the judgments of the trial court terminating her parental rights in her twin sons, A and T.[2] The respondent claims that the trial court improperly (1) held that the Americans with Disabilities Act (ADA), 42 U.S.C. § 12101 et seq., does not apply to termination of parental rights proceedings, (2) found by clear and convincing evidence that the department of children and families (department) had made reasonable efforts at reunification and (3) found that it was in the children's best interests to terminate the respondent mother's rights instead of transferring guardianship. We affirm the judgments of the trial court.

The following facts are necessary to the resolution of this appeal. The respondent has suffered from psychiatric disorders since the 1980s when she was diagnosed

---

[1] The trial court also terminated the respondent father's parental rights, but the respondent father is not a party to this appeal. We refer in this opinion to the respondent mother as the respondent.

[2] In the same action, the trial court committed the respondent's youngest son, C, to the custody of the commissioner of the children and families for a period of twelve months until May 21, 1999. The disposition of C's case is not at issue in this appeal.

with schizo-affective disorder. The respondent was placed on medication that, when taken as directed, improved her condition dramatically. While on the medication, the respondent was able to carry on a nearly normal lifestyle. The respondent received a bachelor of science degree at the University of Connecticut and was just two months short of receiving her nursing degree from Saint Francis Hospital and Medical Center when she stopped taking her medication in 1991. After she stopped taking her medication, her condition deteriorated and she found herself living in shelters.

The respondent gave birth to A and T prematurely at twenty-seven weeks of gestation on December 30, 1994. During the course of her pregnancy with the twins, she did not seek prenatal care and was living with the twins' father. She moved out prior to the twins' birth, however, because the father became physically abusive toward her. The respondent moved into a room in a homeless shelter that was frequently littered with empty alcoholic beverage bottles. When the respondent gave birth to the twins, she had to be placed in four point restraints and be sedated because she was abusive and actively psychotic. Upon her discharge, the respondent was resistant to treatment and failed to take part in the services offered by the department to allow her to take the twins home with her when they were well enough to be discharged. She appeared to be apathetic toward the twins' condition and care.

The respondent, even after the twins' birth, refused offers of assistance and failed to take her medication as prescribed. The commissioner of children and families (commissioner) sought and was granted an order of temporary custody of the twins on February 10, 1995. The commissioner placed A and T with the respondent's brother and sister-in-law in Maine. The children are currently living with their aunt and uncle and have adjusted to their surroundings.

The respondent was admitted to Cedarcrest Regional Hospital, where she remained for a period of one month. She was diagnosed as having a schizo-affective disorder and that diagnosis has not changed over time. The respondent saw Elizabeth Villotas, a psychotherapist, from December, 1995, through May, 1997. Villotas stated that the respondent has a "psychotic illness of sufficient severity to require regular treatment and medication. She has delusional ideas and trouble keeping organized enough for her own care and is extremely unlikely to be able to do so for others, especially young children." Villotas further testified that the respondent was probably in a violent relationship with the father and that there were concerns of domestic violence. The respondent was confused, sometimes admitting to the violence and, other times, denying that any violence occurred.

In addition to the concerns about the respondent's volatile relationship with the father, Villotas suspected that the respondent was abusing alcohol. There were times when Villotas smelled alcohol on the respondent's breath. The consumption of alcoholic beverages while taking her prescribed medications could cause serious sedation and further disorganization in the respondent's life.

When the twins were six months old, the respondent was given strictly supervised visitation rights. At no time did the respondent participate in any medical appointments for the twins nor did she inquire as to their well-being. During her visits, the respondent had episodes where her eyes would roll back and she would appear to be completely unaware of her surroundings. When the respondent had these episodes, Kerry Bell, the social worker assigned to the case, would have to call out the respondent's name to get her to become alert again. The respondent was holding the twins during one of these episodes and dropped one of them on the floor. The commissioner suspended visitation rights

until the respondent obtained a note from a physician stating that she was able to continue with visitation.

In October, 1996, the commissioner transferred the respondent's case to Daniel Huntley, a social worker. Huntley remained on this case and worked with the respondent for approximately eight months. Between October, 1996, and January, 1997, the respondent was pregnant with her third child, C. Catherine Foss, a home health nurse, assisted her with her pregnancy. Foss noticed evidence of domestic abuse during her visits. Additionally, a nurse at Saint Francis Hospital and Medical Center noticed bruises on the respondent's chin, eyes and forearm. When questioned, the respondent admitted that the bruises were from incidents of domestic violence.

The attorney for the twins filed petitions to terminate parental rights on February 9, 1997, which the commissioner joined on March 14, 1997. The commissioner referred the respondent and the father to Catholic Family Services (agency), and in April, 1997, they began classes at the agency's reunification program under the supervision of Isabel Perez. Perez described the reunification program as follows: "Parents come. They have opportunities to do different activities. It could be feeding—of course we have to take into consideration the age of the child. It could be feeding, holding the babies, changing them, playing with them. Using different games." Perez stated that during the course of the program, the respondent's interaction with the children was "limited to the welcome greetings. There was no . . . parent child interaction during [the visit]." Furthermore, Perez noticed no improvement in the respondent's interaction over the course of two months. In fact, there never was a time that Perez felt that she could recommend to the department that the respondent should be given unsupervised visits.

Additionally, the respondent disclosed to Perez that she was suffering from instances of self-destructive

behavior. Based on observations of the respondent, the decision was made by the agency to discontinue the reunification course with the respondent because "it was not the right program for [her]." The fact that the respondent suffered from a mental illness did not affect the agency's decision to terminate her involvement with the reunification program.

The trial court appointed Robert Meier, a psychologist, to evaluate the respondent's mental condition. In a report dated May 26, 1997, Meier stated: "[P]ersonality evaluation results present a profile that is consistent with individuals who have serious emotional problems. Those with this pattern generally lack self-confidence and self-esteem. They tend to be isolated from others, are distrustful, and are seriously lacking in social skills. Their lifestyles are often characterized as schizoid. Thinking is often autistic, fragmented and tangential. There is difficulty concentrating and feelings that things that are not real may be present." Meier stated that when the respondent was on her medication, her condition was markedly improved, but that treatment was not perfect, and the respondent faced episodes where she lost concentration. According to Meier, such episodes might affect her ability to raise her children.

In June, 1997, the commissioner transferred the case to social worker Clordean Davis Mendes. During Mendes' involvement with the respondent, obtaining stable, suitable housing remained a problem for the respondent. Furthermore, the respondent was still not faithfully taking her medication. The respondent also remained in the abusive relationship with the father.

During the course of the department's involvement with the respondent, she has been offered psychiatric treatment, substance abuse counseling, housing assistance and assistance with getting out of her abusive relationship with the father. She refused most of the

services offered, with the exception of the Catholic Family Services program. The respondent rejected the offers of department personnel to pick her up and drive her to specific counseling sessions. Additional facts will be set forth where necessary.

I

The respondent first claims that the trial court improperly held that the ADA does not apply and does not provide a defense to termination of parental rights proceedings.[3] We disagree.

Whether the ADA applies to termination of parental rights proceedings appears to be an issue of first impression[4] before either this court or our Supreme Court and presents a question of law, affording us plenary review. *General Accident Ins. Co. of America* v. *Powers, Bolles, Houlihan & Hartline, Inc.*, 38 Conn. App. 290, 298, 660 A.2d 369, cert. denied, 235 Conn. 904, 665 A.2d 901 (1995).

[3] The department claims that the respondent did not raise her ADA defense at trial. After a thorough review of the transcripts and file, we agree. The trial court, however, allowed the parties to file supplemental trial briefs, in which the respondent raised the issue for the first time. The trial court's memorandum of decision fully addresses the applicability of the ADA to the respondent's case, and the respondent adequately briefed the issue. Furthermore, the commissioner does not claim that we should not review the respondent's claim as inadequately preserved. We choose, therefore, to exercise our discretion and review the respondent's ADA claim.

[4] We have had before us two cases in which the respondents claimed that termination proceedings violated the ADA. In *In re Jessica S.*, 51 Conn. App. 667, 674, 723 A.2d 356 (1999), we refused to review the respondent's claim based on the ADA because it was not properly preserved. In *In re Karrlo K.*, 44 Conn. Sup. 101, 669 A.2d 1249 (1994), aff'd, 40 Conn. App. 73, 668 A.2d 1353 (1996), the mother claimed "terminating the mother's rights as a parent due to her mental disability would violate the [ADA]." The trial court did not address the question of whether the ADA specifically applied to termination of parental rights proceedings. Instead, it stated that it was applying strict scrutiny to the mother's case. Id. We affirmed the trial court's decision without further analysis, stating: "[T]hat memorandum addresses the arguments raised in this appeal . . . ." *In re Karrlo K.*, 40 Conn App. 73, 75, 668 A.2d 1353 (1996).

The ADA provides: "[N]o qualified individual with a disability shall, by reason of such disability, be excluded from participation in or denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. " '[D]isability' means, with respect to an individual—(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual . . . ." 42 U.S.C. § 12102 (2). Congress took the uncommon step of codifying its legislative findings and found that "discrimination against individuals with disabilities persists in such critical areas as *employment, housing, public accommodations, education, transportation, communication, recreation, institutionalization, health services, voting, and access to public services* . . . ." (Emphasis added.) 42 U.S.C. § 12101 (a) (3). Furthermore, Congress found that "the Nation's proper goals regarding individuals with disabilities are to assure *equality of opportunity, full participation, independent living, and economic self-sufficiency* for such individuals . . . ." (Emphasis added.) 42 U.S.C. § 12101 (a) (8).[5]

Because the appellate courts of Connecticut have not addressed the issue of the applicability of the ADA to termination of parental rights proceedings, we look to our sister states for guidance.[6] The leading case is *In re Torrance P.*, 187 Wis. 2d 10, 522 N.W.2d 243 (App. 1994). In *In re Torrance P.*, the Wisconsin Court of Appeals held that "an alleged violation of the ADA is

---

[5] "The purpose of the [ADA] is to place those with disabilities on an equal footing, not to give them an unfair advantage." *Kornblau* v. *Dade County*, 86 F.3d 193, 194 (11th Cir. 1996), citing *In re Rubenstein*, 637 A.2d 1131 (Del. 1994).

[6] We note that some states have held that the ADA applies to termination proceedings, but held that the state had met its burden under the ADA. See *In Interest of C.M.*, 526 N.W.2d 562, 566 (Iowa App. 1994); *In re Angel B.*, 659 A.2d 277, 279 (Me. 1995); *In re Welfare of A.J.R.*, 78 Wash. App. 222, 230, 896 P.2d 1298, cert. denied, 127 Wash. 2d 1021, 904 P.2d 1157 (1995).

not a basis to attack [termination of parental rights] proceedings." Id., 12. Rather, the Wisconsin court held that the proper test was whether the state had made the proper efforts under the Wisconsin termination statute, stating: "The County must show by clear and convincing evidence that 'the agency responsible for the care of the child and the family has made a diligent effort to provide the services ordered by the court' . . . . We held in *In re D.P.*, 170 Wis. 2d 313, 331–32, 488 N.W.2d 133, 140 (Ct. App. 1992), that 'diligent effort' means 'reasonable, earnest and energetic effort.' " (Citation omitted.) *In re Torrance P.*, supra, 14. The Wisconsin court went on to discuss further Congress' intent in enacting the ADA. "Congress did not intend to change the obligation imposed by unrelated statutes. [The father] may have a separate cause of action under the ADA based on the County's actions or inactions; such a claim, however, is not a basis to attack the [termination] proceedings." Id., 16.

In *In re B.S., Juvenile*, 166 Vt. 345, 351–52, 693 A.2d 716 (1997),[7] the Supreme Court of Vermont held that termination proceedings are not "services, programs or activities within the meaning of Title II of the ADA

---

[7] The respondent mother in *In re B.S., Juvenile*, was "a moderately retarded woman." *In re B.S., Juvenile*, supra, 166 Vt. 346. "The mother's . . . claim of error is that the court improperly terminated her parental rights without addressing her claims under Title II of the [ADA]. . . . She relies on the fact that she is mentally retarded and mental retardation is a disability with the meaning of the ADA. . . . She argues that, with help, she has the capacity to care for her child and is therefore a qualified person eligible for accommodation under the ADA. . . . She claims that [the department of social and rehabilitation services (SRS)] has failed to accommodate her disability and, as a result, has discriminated against her in the provision of the services needed to parent her child." (Citations omitted.) Id., 350–51.

The Vermont Supreme Court stated: "The issue is not, however, whether SRS properly treated the parents or treated them consistent with the requirements of the ADA. The issue instead is whether SRS's alleged violation of requirements of the ADA may be raised as a defense to a [termination] petition. The family court ruled that ADA noncompliance is not a defense. We agree." Id., 351.

. . . . Thus the anti-discrimination requirement does not directly apply to [termination] proceedings." (Citation omitted; internal quotation marks omitted.) As in *In re Torrance P.*, the Vermont court held that the mother whose rights had been terminated could have filed *a separate ADA claim* if the state had indeed violated her civil rights under the ADA. See also *Stone v. Daviess County Director of Child Services*, 656 N.E.2d 824, 830 (Ind. Ct. App. 1995) (state required no reunification efforts by department; therefore, ADA not defense to termination proceeding; "any alleged noncompliance with the ADA . . . would be a matter separate and distinct from the operation of our termination statute"); *In re B.K.F.*, 704 So. 2d 314, 317 (La. App. 5 Cir. 1997), appeal denied, 709 So. 2d 779 (La. 1998) (termination proceedings not "services programs or activities" under ADA; therefore, ADA not defense to termination proceedings).

We conclude that the reasoning applied in *In re Torrance P.* is sound and we follow the Wisconsin court's reasoning that the ADA neither provides a defense to nor creates special obligations in a termination proceeding. We further agree with the Supreme Court of Vermont's decision in *In re B.S., Juvenile*, that a termination proceeding is not a "service, program or activity" under the ADA. The Wisconsin decision is especially persuasive because the Wisconsin termination statute, much like our own,[8] sets forth the minimum efforts the state must make to reunify the children with the parent.

We note that, even if the ADA were an appropriate defense in termination proceedings, the parent's rights

---

[8] General Statutes (Rev. to 1997) § 17a-112 (c) provides in relevant part: "The Superior Court upon hearing and notice . . . may grant a petition filed pursuant to this section if it finds by a clear and convincing evidence (1) *that the Department of Children and Families has made reasonable efforts to locate the parent and to reunify the child with the parent* . . . ." (Emphasis added.)

are not absolute. See *Wisconsin* v. *Yoder*, 406 U.S. 205, 233–34, 92 S. Ct. 1525, 32 L. Ed. 2d 15 (1971) (parent's constitutional rights may be overcome if health or safety of child in danger). Our Supreme Court has held that a parent's rights can be terminated because of her mental condition, even if she is not at fault. "In weighing the interests of the child against the hardship imposed on the parent, the legislature may properly strike the balance at the point where the mental or physical deficiency, even though not involving fault, is so great as to render the parent incapable of measuring up to the child's needs as those are delineated in § 17-43a (a)(3) [now § 17a-112 (c)]." *In re Juvenile Appeal (83-BC)*, 189 Conn. 66, 78–79, 454 A.2d 1262 (1983). "Termination has been consistently recognized as being in the best interest of the child when the parent has a mental deficiency or illness which renders her unable to provide the child with necessary care." *In re Nicolina T.*, 9 Conn. App. 598, 605, 520 A.2d 639, cert. denied, 203 Conn. 804, 525 A.2d 519 (1987).

The trial court heard testimony from numerous social workers and health care professionals that the respondent had a permanent mental condition. The respondent neglected to take her medication as prescribed and, without that medication, she is unable to care for her children. The trial court properly held that the ADA was not a defense to the termination of parental rights proceeding.[9]

---

[9] Our holding in this case concerns only the applicability of the ADA to termination proceedings. As such, we do not suggest that the ADA does not apply to the reunification services and programs that the department must make to meet the parents' specialized needs. See *In re B.S., Juvenile*, supra, 166 Vt. 345; *In re Torrance P.*, supra, 522 N.W.2d 243. Moreover, we note that § 17a-112 requires the department to make reasonable efforts at reunification. This includes taking the parent's mental condition into consideration. A failure to provide adequate services because of the parent's mental condition would violate not only § 17a-112, but the ADA, 42 U.S.C. § 12132. Such a violation would give rise to a separate cause of action under the ADA. We emphasize, however, that the ADA does not give rise to an affirmative defense to the adjudicatory and dispositional phases of termination of paren-

II

The respondent next claims that the trial court improperly found that the department had made reasonable efforts at reunification as required by General Statutes § 17a-112 (c) (1). We disagree.

"On appeal, our function is to determine whether the trial court's conclusion was legally correct and factually supported. . . . We do not examine the record to determine whether the trier of fact could have reached a conclusion other than the one reached . . . nor do we retry the case or pass upon the credibility of the witnesses. . . . Rather, on review by this court every reasonable presumption is made in favor of the trial court's ruling." (Citations omitted; internal quotation marks omitted.) *In re Eden F.*, 48 Conn. App. 290, 309, 710 A.2d 771, cert. granted on other grounds, 245 Conn. 917, 717 A.2d 234 (1998).

"Before a termination of parental rights can be granted, the trial court must be convinced that the department has made reasonable efforts to reunite the [children] with [their] family. The term reasonable efforts was recently addressed by this court: Turning to the statutory scheme encompassing the termination of the parental rights of a child committed to the department, the statute imposes on the department the duty, inter alia, to make reasonable efforts to reunite the child or children with the parents. The word reasonable is the linchpin on which the department's efforts in a particular set of circumstances are to be adjudged, using the clear and convincing standard of proof. Neither the word reasonable nor the word efforts is, however, defined by our legislature or by the federal act from which the requirement was drawn. . . . [R]eason-

tal rights proceedings. See *State* v. *Valinski*, 53 Conn. App. 23, 731 A.2d 311 (1998), cert. granted on other grounds, 249 Conn. 924, 733 A.2d 847 (1999) (authority to declare affirmative defenses rests with legislature).

able efforts means doing everything reasonable, not everything possible." (Internal quotation marks omitted.) *In re Tabitha T.*, 51 Conn. App. 595, 600, 722 A.2d 1232 (1999).

In essence, similar to her first claim, the respondent claims that because of her mental illness, the department was required to provide additional reunification efforts than those provided to mentally healthy parents. We agree with the respondent that the department is required, pursuant to § 17a-112 (c) (1), to take into consideration her mental condition when determining what "reasonable efforts" to make at reunification. We conclude, however, that the trial court properly found that the steps taken by the department met the statutory mandate.

The respondent correctly states in her brief that the question of reasonableness is a question of fact to be determined by the trier. The trial court found: "There is no evidence that [the respondent] ever completed an alcohol assessment or treatment program, dealt with the domestic violence issues in her life, her transient housing or income until recently, when she became eligible for social security disability income. [The department] offered an alcohol assessment with Advanced Behavioral Health, but [the respondent] denied she had a problem and did not attend. [Bell], the [department] social worker, testified that she made two appointments for [the respondent] and provided her with information and offered transportation. [The respondent] did not attend, 'she was agitated and all she wanted was an attorney.' [Bell] then offered her transportation to an attorney which was also refused. [Bell] further testified that [the respondent] has been unable to maintain housing and had been intermittently homeless, living in shelters. . . . [The respondent] resisted discussing [domestic violence] issues in their therapy sessions. She has never been receptive to counseling and assistance for domestic violence.

"Visitation . . . confirmed the same behaviors. [The respondent's] behavior was variable, sometimes she was able to interact on a limited basis, and sometimes she was not. Not only was her behavior unpredictable, but she . . . [was] not attentive to [her] children, their needs and safety . . . .

\* \* \*

"[The respondent] rejected many of the services offered to her, rejected her need to be stabilized with the help of regular medication and did very little to attempt to rehabilitate herself. . . . [The respondent] did not choose to accept services from [the department]."

Testimony from Bell, Mendes, Huntley and Meier reflect that the department made numerous attempts at assisting the respondent and, specifically, attempted to treat the problems associated with her mental condition. While the respondent, in her brief, alleges that the efforts failed to equal "reasonable efforts," she does not point to any additional efforts that the department could have made. Furthermore, the file and transcripts indicate that the respondent did not make the trial court aware that she demanded that a heightened standard should apply until after trial. The department is required only to make "reasonable efforts." It is axiomatic that the law does not require a useless and futile act. See *Connecticut Light & Power Co.* v. *Costello*, 161 Conn. 430, 441, 288 A.2d 415 (1971). After a thorough review of the file and transcripts, we conclude that there is sufficient evidence on which the trial court reasonably found by clear and convincing evidence that the department made reasonable efforts at reunification considering her mental condition.

III

The respondent last claims that the trial court improperly found that it was in A's and T's best interests to

terminate her parental rights instead of transferring guardianship. We are not persuaded.

"The state has a substantial interest in protecting minor children; *Stanley* v. *Illinois*, [405 U.S. 645, 649, 92 S. Ct. 1208, 31 L. Ed. 2d 551 (1972)]; *Prince* v. *Massachusetts*, 321 U.S. 158, 166, 64 S. Ct. 438, 88 L. Ed. 645 (1944); intervention in family matters by the state is justified, however, only when such intervention is actually in the best interests of the child, a standard long used in this state. . . . *State* v. *Anonymous*, 179 Conn. 155, 165, 425 A.2d 939 (1979); *In re Juvenile Appeal (Anonymous)*, 177 Conn. 648, 661–62, 420 A.2d 875 (1979)." (Citation omitted; internal quotation marks omitted.) *In re Juvenile Appeal (83-CD)*, 189 Conn. 276, 285, 455 A.2d 1313 (1983). Our Supreme Court has further recognized the "deleterious effects of prolonged temporary placement on the child . . . ." Id., 292. Because of these effects, time is of the essence. Id.

Meier testified that a transfer of guardianship would place A and T in possibly a temporary setting. Meier was concerned over the twins' placement: "My concern about not having a permanent solution for the children is that at some point a year, two years, ten years from now the parents could change their minds, could then make a request that the children then be returned to them, could reopen the case and I think that would be very destructive to the children. My main focus in the interest of the children would be that the children have stability and consistency and permanency as soon as possible. . . . I think the long-term risk of not having the children permanently placed somewhere opens the opportunity that their lives could be disrupted later in their lives." The trial court further stated that it was concerned about the possible relitigation over the respondent's parental rights in A and T if it ordered a transfer of guardianship as opposed to ordering termination of the respondent's parental rights. The trial

court found: "[B]ased on the evidence, that such lack of permanency in their placement is not in the twins' best interests."

General Statutes (Rev. to 1997) § 17a-112 (e)[10] provides seven findings that the trial court must consider before it issues a termination order. In its memorandum of decision, the trial court made the seven findings required by § 17a-112 (e). The trial court found by clear and convincing evidence that the department made reasonable reunification and rehabilitation efforts. The trial court found that the children have good ties to their aunt and uncle while having only "tenuous ties" to the respondent. The trial court further found that the respondent has been unable to accomplish steps at rehabilitating herself. On the basis of these findings,

[10] General Statutes (Rev. to 1997) § 17a-112 (e) provides in relevant part: "Except in the case where termination is based on consent, in determining whether to terminate parental rights under this section, the court shall consider and shall make written findings regarding: (1) The timeliness, nature and extent of services offered, provided and made available to the parent and the child by an agency to facilitate the reunion of the child with the parent; (2) whether the Department of Children and Families has made reasonable efforts to reunite the family pursuant to the federal Adoption Assistance and Child Welfare Act of 1980, as amended; (3) the terms of any applicable court order entered into and agreed upon by any individual or agency and the parent, and the extent to which all parties have fulfilled their obligations under such order; (4) the feelings and emotional ties of the child with respect to his parents, any guardian of his person and any person who has exercised physical care, custody or control of the child for at least one year and with whom the child has developed significant emotional ties; (5) the age of the child; (6) the efforts the parent has made to adjust his circumstances, conduct, or conditions to make it in the best interest of the child to return him to his home in the foreseeable future, including, but not limited to, (A) the extent to which the parent has maintained contact with the child as part of an effort to reunite the child with the parent, provided the court may give weight to incidental visitations, communications or contributions and (B) the maintenance of regular contact or communication with the guardian or other custodian of the child; and (7) the extent to which a parent has been prevented from maintaining a meaningful relationship with the child by the unreasonable act or conduct of the other parent of the child, or the unreasonable act of any other person or by the economic circumstances of the parent."

which are not clearly erroneous, we will not disturb the trial court's finding that termination of the respondent's parental rights is in the best interests of A and T.

The judgment is affirmed.

In this opinion the other judges concurred.