[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
These are petitions to terminate parental rights with respect to five children. The petitions were tried jointly. The court finds the following facts.
The children's mother, Joanna C. (mother) was born in Puerto Rico. Her parents were separated during her early childhood. Her mother was an alcoholic who physically abused her. When she was fourteen, she was sent to visit her father. During the visit, her father sexually abused her.
The mother attended school only until fifth grade. She later attained a GED. When she was fourteen, the mother began using marijuana. When she was fifteen, she began using cocaine, including crack cocaine. When she was eighteen she became pregnant by the respondent Ramon A. (Sr.). She had four children by him, all of whom are subjects of these proceedings: Joanna A., born August 1992; Ramon A., born September 1993; Ashley A., born February 1995, and Stephanie C., born May 1996. While still living in Puerto Rico she met the respondent Edgar R. (respondent).
The respondent was born in Puerto Rico on August 19, 1960. He was forty years of age at the time of trial.
As a young man, the respondent used marijuana and alcohol heavily. When he was thirty, he began using heroin. The respondent relocated to the United States and, in April, 1997, the mother followed him with her four children.
Once in the United States, the respondent and the mother moved to Bridgeport, Ct. with the children. The couple began using cocaine and heroin, and the mother became pregnant by Edgar.
In May, 1997, an anonymous call to the Department of Children and Families (DCF) brought the family to the attention of that agency. The case was assigned to DCF social worker Jorge Ball. Ball examined the apartment in which the family resided and found it filthy, roach infested and with little food. The children were dirty and had foul odors. Ball referred the mother to ECAR[1] and arranged for the respondent and the mother to undergo substance abuse evaluations. An evaluation was attempted on the respondent but he delivered a "cold" urine sample to the evaluation that was not his. CT Page 3438
In October, 1997, DCF received another anonymous call regarding the children. The apartment was again inspected and was found to be filthy. The mother denied any drug or alcohol abuse. She had not sought prenatal care. Ball was informed by ECAR that the mother was not been cooperating with its services. After an investigation, the case was closed.
In November, 1997, a mandated reporter[2] contacted DCF and stated that Joanna A. was outside, unsupervised, dressed improperly and picking garbage for food and eating it.
By December, 1997, the mother was living in a YWCA shelter with Joanna, Ramon and Stephanie. The shelter was appropriate for children. There was food available and the mother was eligible for AFDC monies. At this time, Ashley was staying with the respondent's sister, in Bridgeport. When the mother attempted to take Ashley with her, an altercation erupted between the mother and the respondent's sister. As a result, DCF took custody of all the children pursuant to a ninety-six hour hold[3] and placed them in foster care. On December 16, 1997, DCF obtained an order of temporary custody (OTC) from the court (Arnold,J.). The same day, DCF filed petitions alleging that the children were neglected and uncared for.
The mother, who at this time was daily using crack cocaine and heroin, entered the Regional Network of Programs and was placed on a methadone maintenance program.
On January 1998, the mother gave birth to Angel R. The baby was born with evidence of methadone withdrawal. On January 10, 1998, the court (Arnold, J.) granted DCF's application for an OTC with respect to Angel. DCF took Angel into custody at the hospital and placed him in foster care. On January 22, 1998, DCF filed a petition alleging that Angel was neglected and uncared for.
Around the time that his son being taken into custody, the respondent was referred for substance abuse evaluations at Advanced Behavioral Health and the Guenster Rehabilitation Center. The respondent never cooperated with these service providers.
The respondent did not request visitation with his son until September, 1998. At that time, he telephoned DCF, said that he was in New York and was coming to Connecticut. On October 22, 1998, the respondent visited with Angel and his siblings for the first time that year. In her notes of the visit, the social worker states that she "was able to observe the strong expression of love from the children to [the respondent]. . . . [The respondent] was very happy to see his baby boy after 8 moths [sic]." (Exhibit AA)[4] The respondent also visited CT Page 3439 Angel on January 16, 1999 and in March and April, 1999. He also saw Angel briefly and rarely at the child's foster parent's store, which he visited with the mother.[5]
On February 18, 1999, the court issued expectations to the respondent that included the following orders: keep all appointments set by or with DCF; keep your own whereabouts known to DCF, your attorney and the attorney for the child; participate in parenting counseling and make progress toward (1) providing a stable home for the child, (2) refrain from any drug usage or criminal activity, (3) visit with child as provided by the Department of Children and Families; accept and cooperate with in-home support services referred by DCF; submit to substance abuse assessment and treatment and follow recommendations regarding treatment, including inpatient treatment if necessary and follow recommendations regarding aftercare treatment, including relapse prevention; submit to random drug testing, the time and method of the testing shall be at the discretion of DCF; follow recommendations of service providers, to be identified; obtain and/or cooperate with a restraining or protective order and/or other appropriate safety plan as approved by DCF to avoid further domestic violence incidents; sign releases authorizing DCF to communicate with service providers to monitor attendance, cooperation and progress toward identified goals, and for use in future proceedings before this Court; have no involvement with the criminal justice system; immediately advise DCF of any changes in the composition of your household to ensure that the change does not compromise the health and safety of the child; attend parenting classes.[6]
Between April, 1999 and 2000, the respondent never called DCF to ask about his son's welfare. The respondent visited Angel twice in May, 2000. After these visits, he did not schedule or request additional visits. After the case was assigned to DCF social worker Janet Quintanilla, in April, 2000, the respondent called DCF about six times inquiring about Angel. The respondent later visited Angel in November, 2000.
The respondent did not appear for trial. He has continuously been represented by court-appointed counsel. From his counsel's statements to the court, the court finds that the respondent was actually aware of the dates of trial.
The children have remained in foster care since they were taken into custody by DCF. On May 18, 1998, all five children were adjudicated uncared for[7] and committed to the custody of DCF. On August 12, 1999, DCF filed the petitions to terminate parental rights that are the subject of these proceedings. The case was tried to the court on January 8, 2001 and January 10, 2001. CT Page 3440
 I
"Our statutes define the termination of parental rights as the complete severance by court order of the legal relationship, with all its rights and responsibilities, between the child and his parent. . . . It is a most serious and sensitive realm of judicial action. . . . To justify the termination of parental rights in the absence of consent, one or more of the grounds set forth in General Statutes [Rev. 1999] § [17a-112 (c) (3)] must be proven by clear and convincing evidence. . . .
"Section [17a-112 (c)(3)] carefully sets out . . . [the] situations that, in the judgment of the legislature, constitute countervailing interests sufficiently powerful to justify the termination of parental rights in the absence of consent. [The commissioner], in petitioning to terminate those rights, must allege and prove, by clear and convincing evidence, one or more of the statutory grounds. In contrast to custody proceedings, in which the best interests of the child are always the paramount consideration-and, in fact, usually dictate the outcome, in termination proceedings the statutory criteria must be met before termination can be accomplished and adoption proceedings can begin. No all-encompassing best interests standard vitiates the requirement of compliance with the statutory criteria. . . ." (Internal quotation marks omitted.) In re Antonio M., 56 Conn. App. 534, 538, 744 A.2d 915
(2000).
"A hearing on a petition to terminate parental rights consists of two phases, adjudication and disposition. . . . In the adjudicatory phase, the trial court determines whether one of the statutory grounds for termination of parental rights exists by clear and convincing evidence. If the trial court determines that a statutory ground for termination exists, it proceeds to the dispositional phase. In the dispositional phase, the trial court determines whether termination is in the best interests of the child. . . ." (Internal quotation marks omitted.) In reJohn G., 56 Conn. App. 12, 17, 740 A.2d 496 (1999).
 II
While the case was sub judice, DCF filed a "suggestion of death" stating that the mother had, tragically, died on February 25, 2001.[8]
Attached to that pleading was a letter from the Office of the Chief Medical Examiner so stating. This raises the question as to whether the petitions are moot with respect to the mother.
"Because courts are established to resolve actual controversies, before a claimed controversy is entitled to a resolution on the merits it must CT Page 3441 be justiciable. Justiciability requires . . . that there be an actual controversy between or among the parties to the dispute: Courts exist for determination of actual and existing controversies, and under the law of this state the courts may not be used as a vehicle to obtain judicial opinions on points of law. . . . A case becomes moot when due to intervening circumstances a controversy between the parties no longer exists." (Citations omitted; internal quotation marks omitted.) CrestPontiac Cadillac, Inc. v. Hadley, 239 Conn. 437, 439 n. 3, 685 A.2d 670
(1996). "A case that is nonjusticiable must be dismissed for lack of subject matter jurisdiction." Mayer v. Biafore, 245 Conn. 88, 91,713 A.2d 1267 (1998). "The court . . . may act on its own motion, and should do so when the lack of jurisdiction is called to its attention. . . ." State v. Anonymous, 240 Conn. 708,718, 694 A.2d 766 (1997).
Even where intervening developments would otherwise render an action moot, the court may retain jurisdiction where the litigation implicates collateral disputes or where there are collateral consequences prejudicial to the interests of a party, Crest Pontiac Cadillac, Inc. v.Hadley, supra, 239 Conn. 439 n. 3; Dawson v. Farr, 227 Conn. 780, 782-83,632 A.2d 41 (1993).
"The commonly understood general obligations of parenthood entail these minimum attributes: (1) express love and affection for the child; (2) express personal concern over the health, education and general well-being of the child; (3) the duty to supply the necessary food, clothing, and medical care; (4) the duty to provide an adequate domicile; and (5) the duty to furnish social and religious guidance. . . ." (Internal quotation marks omitted.) In reJohn G., supra, 56 Conn. App. 20-21.
Obviously, the deceased cannot express love, affection or concern for her children or provide them guidance. Nor are there any circumstances which would suggest that the mother's estate, which is undoubtedly de minimis, is liable to discharge a duty to supply the children with food, clothing, medical care or shelter. See McCann v. McCann, 191 Conn. 447,452, 464 A.2d 825 (1983).[9] Therefore, insofar as the petitions seek to terminate the mother's parental rights they are moot and are dismissed. See In re Darnell D., Superior Court, Judicial District of New Haven (Sept. 29, 1992).
 III (Edgar R.) A.
DCF petitions to terminate the parental rights of the respondent with CT Page 3442 respect to his son, Angel.
"Before a termination of parental rights can be granted, the trial court must be convinced that the department [of children and families] has made reasonable efforts to reunite the [child with the] family." (Internal quotation mark omitted.) In re Savanna M., 55 Conn. App. 807,812, 740 A.2d 484 (1999). "General Statutes [Rev. 1999] § 17a-112 (c) provides in relevant part that `[t]he Superior Court . . . may grant a petition filed pursuant to this section if it finds by clear and convincing evidence (1) that the Department of Children and Families has made reasonable efforts to locate the parent and to reunify the child with the parent, unless the court finds in this proceeding that the parent is unable or unwilling to benefit from reunification efforts. . . .' `The word reasonable is the linchpin on which the department's efforts in a particular set of circumstances are to be adjudged, using the clear and convincing standard of proof. . . .' Furthermore, `reasonable efforts means doing everything reasonable, not everything possible . . . [but] such efforts should not make it impossible to attain reunification in a given case. . . .'" Inre Amber B., 56 Conn. App. 776, 784, 746 A.2d 222
(2000). Thus, the test is reasonable efforts, not best efforts.
"Reasonableness is an objective standard . . . and whether reasonable efforts have been proven depends on the careful consideration of the circumstances of each individual case." (Internal quotation marks omitted.) In re Hector L., 53 Conn. App. 359, 372, 730 A.2d 106 (1999)." [T]he question of reasonableness is a question of fact to be determined by the trier." In re Antony B., 54 Conn. App. 463, 475, 735 A.2d 893
(1999).
General Statutes (Rev. 1999) § 17a-112 (c) provides that a finding that DCF used reasonable efforts to reunify the family "is not required if the court has determined at a hearing pursuant to subsection (b) of section 17a-110 or section 17a-111b that such efforts are not appropriate." The court made such a finding on May 12, 1999. However, such a finding does not vitiate the requirement that DCF use, and that the court find that it used, reasonable efforts to reunify from the time it takes custody of a child to a reasonable time preceding the court's "no further efforts" finding, "unless the court finds in this proceeding that the parent is unable or unwilling to benefit from reunification efforts. . . ." In re Gilbert C., Superior Court, Child protection Session at Middletown, No. H14-CP97-005326-A (January 2, 2001).
As observed supra, DCF referred the respondent for substance abuse evaluation at Advanced Behavioral Health and the Guenster Rehabilitation Center. The respondent, who was residing in New York City, was CT Page 3443 uncooperative with these services. DCF also offered the respondent visitation. The respondent's response was to offer his mother as a resource. Not until September, 1998 did the respondent express an interest in visitation.
While the respondent might have benefitted from parenting classes, since he had chosen to live in New York City and manifested only a sporadic interest in his son it was not unreasonable for DCF not to offer this additional service[10] "It is axiomatic that the law does not require a useless and futile act." In re Antony B., supra,54 Conn. App. 476. Moroever, as Dr. Jill Edgar, who conducted an evaluation of the respondent, opined, the respondent's primary problem is not a lack of capacity to parent but a lack of interest in being a pemanent parent. The court finds by clear and convincing evidence that DCF used reasonable efforts to "reunify" the respondent and his son.
 B.
In its petition, DCF alleges two grounds on which it seeks to have the respondent's parental rights terminated. The court first addresses DCF's claim that there is no parent-child relationship between the respondent and his son.
General Statutes (Rev. to 1999) § 17a-112 (c)(3)(D) provides for the termination of parental rights if, upon clear and convincing evidence, it is proved that "there is no ongoing parent-child relationship, which means the relationship that ordinarily develops as a result of a parent having met on a day to day basis the physical, emotional, moral and educational needs of the child and to allow further time for the establishment or reestablishment of such parent-child relationship would be detrimental to the best interest of the child. . . ."
[T]he statute requires the trial court to undertake a two-pronged analysis. First, there must be a determination that no parent-child relationship exists, and second, the court must look into the future and determine whether it would be detrimental to the child's best interest to allow time for such a relationship to develop. . . .
"It is reasonable to read the language of no ongoing parent-child relationship to contemplate a situation in which, regardless of fault, a child either has never known his or her parents, so that no relationship has ever developed between them, or has definitively lost that relationship, so that despite its former existence it has now been completely displaced. . . . In considering whether an ongoing parent-child relationship exists, the feelings of the child are of paramount importance. . . . . The ultimate question is whether the child CT Page 3444 has no present memories or feelings for the natural parent. . . . Feelings for the natural parent connotes feelings of a positive nature only. . . ." (Internal quotation marks omitted.) In re John G., supra,56 Conn. App. 22-23. Where, however, the child is still an infant, as inValerie D., "the inquiry must focus, not in the feelings of the infant but on the positive feelings of the natural parent." In re Valerie D., supra, 223 Conn. 532. This is so because the present feelings of a virtually newborn infant "can hardly be discerned with any reasonable degree of confidence." Id.
DCF has failed to adduce credible evidence that at the time the termination petition was filed Angel had no present memories or feelings of a positive nature. Indeed, the social worker's notes of an October 22, 1998 visit between the respondent and all of the children, including Angel who was then nine months old, states that "there was a strong expression of love from the children to [the respondent]." The respondent reciprocated this affect in this and subsequent visits. Although an interaction study between the respondent and his son conducted on May 8, 2000 reflects that the child did not have present memories or feelings for the respondent, the study was conducted nearly nine months after the filing of the petition and over a year after the respondent's last visit with Angel. Under these circumstances, the study does not reliably reflect the child's feelings or memories as of the adjudicatory date. "In making the adjudicatory determination, the court is limited to considering events preceding the filing of the termination petition or the latest amendment." In re Kasheema L., 56 Conn. App. 484, 487,744 A.2d 441, cert. denied, 252 Conn. 945, 747 A.2d 522 (2000); id., 490; see Practice Book § 33-3(a).
It is not a parent's burden to disprove the allegations of a termination petition but, rather, the petitioner's burden to prove them and to do so by clear and convincing evidence. In re Shannon S.,41 Conn. Sup. 145, 146, 562 A.2d 79, aff'd, 19 Conn. App. 20, 560 A.2d 993
(1989). This the petitioner has not done. Insofar as it seeks termination of the respondent's parental rights based on the absence of an ongoing parent-child relationship, the petition is denied.
 C.
The remaining ground on which DCF seeks to terminate the respondent's parental rights are his failure to be rehabilitated.
"Section 17a-112 (c)(3)(B) [Rev. 1999] requires the court to determine whether the degree of personal rehabilitation . . . encourage[s] the belief that within a reasonable time . . . such parent could assume a responsible position in the life of the child. . . . CT Page 3445 Personal rehabilitation refers to the reasonable foreseeability of the restoration of a parent to his or her former constructive and useful role as a parent, not merely the ability to manage his or her own life. . . .
"Rehabilitation does not require the parent to be able to assume full responsibility for a child without the use of available support programs. . . . An inquiry regarding personal rehabilitation requires us to obtain a historical perspective of the respondent's child-caring and parenting abilities. . . . What constitutes a reasonable time is a factual determination that must be made on a case-by-case basis." (Emphasis in original; citations omitted; internal quotation marks omitted.) In reStanley D., 61 Conn. App. 224, 230-31, 763 A.2d 83 (2000).
Prior to Angel's commitment to DCF in 1998, the respondent was abusing heroin, as well as cocaine. The respondent argues, however, that DCF has failed to prove by clear and convincing evidence that he had any drug problem at the time this petition was filed.
The court disagrees. In the expectations issued by the court, the respondent was ordered to submit to substance abuse evaluations. The respondent failed to appear for those at the Guenster Rehabilitation Center in March, 1999 and April, 1999. Whether a parent has a substance abuse problem, of necessity, cannot depend on the parent's assertion to the contrary nor can the court or DCF monitor the parent's daily activities to observe any substance abuse. Necessarily, proof of the existence of ongoing substance abuse depends on the parent submitting to periodic evaluations. A parent with a recent substance abuse history cannot defy the court's order, refuse to be tested, then claim a lack of evidence of substance abuse. Were it otherwise, the statutory ground of failure to rehabilitate would in many contemporary instances be illusory.[11] Moreover, the failure of a parent to comply with reunification services, such as drug evaluation, is a frequently cited basis for a finding of failure to rehabilitate. See In re Tyscheicka H.,61 Conn. App. 19, 25, 762 A.2d 916 (2000); In re Quanitra M.,60 Conn. App. 96, 100, 758 A.2d 863, cert. denied, 255 Conn. 903,760 A.2d 152 (2000); In re Kasheema L., 56 Conn. App. 484, 486,744 A.2d 441 (2000); In re Amber B., supra, 56 Conn. App. 782; In reAntony B., supra, 54 Conn. App. 465; In re Galen F., 54 Conn. App. 590,596, 737 A.2d 499 (1999); In re Roshawn R., 51 Conn. App. 44, 53,720 A.2d 1112 (1998); In re Jessica B., 50 Conn. App. 554, 563,718 A.2d 997 (1998); In re Danuael D., 51 Conn. App. 829, 839, 724 A.2d 546
(1999); In re Marvin M., 48 Conn. App. 563, 566, 711 A.2d 757, cert. denied, 245 Conn. 916, 719 A.2d 900 (1998); In re Soncheray H.,42 Conn. App. 664, 668, 680 A.2d 1363, cert. denied, 239 Conn. 940,684 A.2d 712 (1996); In re Christina V., 38 Conn. App. 214, 216,660 A.2d 863 (1995). CT Page 3446
In addition, the respondent visited infrequently and sporadically after his son was taken into custody, and not at all between April, 1999 and the filing of the petition. The failure to exercise available visitation is also an obvious and frequently cited basis for failure to rehabilitate. See In re John G., supra, 56 Conn. App. 18; In re ShylieshH., 56 Conn. App. 167, 174, 743 A.2d 165 (1999); In re Galen F.,54 Conn. App. 590, 596, 737 A.2d 499 (1999); In re Soncheray H.,42 Conn. App. 664, 668, 680 A.2d 1363, cert. denied 239 Conn. 940,684 A.2d 712 (1996); In re Passionique T., 44 Conn. Sup. 551, 564,695 A.2d 1107 (1996); In re Shannon S., 41 Conn. Sup. 145, 156,562 A.2d 79, aff'd and adopted, 19 Conn. App. 20, 560 A.2d 993 (1989).
The reality is that after custody of Angel was taken until the filing of the petition to terminate his parental rights, the respondent absented himself from his son's life for lengthy periods of time and failed to submit to substance abuse assessments. The respondent has never offered himself as a resource. See In re Savanna M., 55 Conn. App. 807, 813,740 A.2d 484 (1999). Moreover, the respondent failed to appear for trial where he might have refuted the evidence against him. By clear and convincing evidence, the court finds that as of the adjudicatory date, the respondent's degree of personal rehabilitation does not encourage the belief that within a reasonable time he could assume a responsible position in the life of his son. General Statutes (Rev. 1999) § 17a-112
(c)(3)(B).
 D. 1.
"In the dispositional phase of a termination of parental rights hearing, the trial court must determine whether it is established by clear and convincing evidence that the continuation of the parents' parental rights is not in the best interests of the child. In arriving at that decision, the court is mandated to consider and make written findings regarding seven factors delineated in General Statutes [(Rev. to 1999) § 17a-112 (d) [now § 17a-112 (k)]." (Footnote omitted; internal quotation marks omitted.) In re Deana E., 61 Conn. App. 185,189-190, 763 A.2d 37 (2000).
1. Finding regarding the timeliness, nature and extent of servicesoffered, provided, and made available to the parent and the child by achild-placing agency to facilitate the reunion of the child with theparent.
The respondent was offered substance abuse evaluations and visitation CT Page 3447 with his son.
2. Finding regarding whether DCF has made reasonable efforts to reunitethe family pursuant to the Federal Child Welfare Act of 1980, asamended.
The court finds that DCF made reasonable efforts to reunite the family.
3. Finding regarding the terms of any applicable court order enteredinto and agreed upon by any individual or child-placing agency and theparent, and the extent to which all parties have fulfilled theirobligations under such order.
On February 18, 1999, the court issued expectations to the respondent that included the following orders: keep all appointments set by or with DCF; keep your own whereabouts known to DCF, your attorney and the attorney for the child; participate in parenting counseling and make progress toward (1) providing a stable home for the child, (2) refrain from any drug usage or criminal activity, (3) visit with child as provided by the Department of Children and Families; accept and cooperate with in-home support services referred by DCF; submit to substance abuse assessment and treatment and follow recommendations regarding treatment, including inpatient treatment if necessary and follow recommendations regarding aftercare treatment, including relapse prevention; submit to random drug testing, the time and method of the testing shall be at the discretion of DCF; follow recommendations of service providers, to be identified; obtain and/or cooperate with a restraining or protective order and/or other appropriate safety plan as approved by DCF to avoid further domestic violence incidents; sign releases authorizing DCF to communicate with service providers to monitor attendance, cooperation and progress toward identified goals, and for use in future proceedings before this Court; have no involvement with the criminal justice system; immediately advise DCF of any changes in the composition of your household to ensure that the change does not compromise the health and safety of the child; attend parenting classes.
The respondent failed to consistently visit his son more than a very few times, absenting himself from his son's life for lengthy periods of time. After Angel was taken into custody, the respondent lived in New York City with his parents. There is no evidence that this was not a stable home, but the home is not the respondent's. There is no direct evidence that the respondent abused drugs but, as discussed supra, the respondent failed to submit to substance abuse assessments.
There is no evidence that the respondent engaged in criminal activity CT Page 3448 or had any "involvement with the criminal justice system."[12] Nor is there evidence that he failed to sign releases as requested by DCF, but since the respondent did not cooperate with service providers, releases would have been ineffectual.
4. Finding regarding the feelings and emotional ties of the child withrespect to the child's parents, any guardian of the child's person andany person who has exercised physical care, custody or control of thechild for at least one year and with whom the child has developedsignificant emotional ties.
The child no longer has feelings for or emotional ties to the father, having seen him only three times since April, 1999. There is a bond and affection between Angel and his foster mother. She is his psychological parent. (See Exhibit N) However, she is not his preadoptive mother. DCF's plan is to move Angel from his current placement and to place him either with his paternal grandmother or in another preadoptive home.
5. Finding regarding the age of the child.
Angel is now three years old.
6. Finding regarding the efforts the parent has made to adjust suchparent's circumstances, conduct or conditions to make it in the bestinterest of the child to return the child to the parent's home in theforeseeable future, including, but not limited to: (A) the extent towhich the parent has maintained contact with the child as part of aneffort to reunite the child with the parent; provided the court may giveweight to incidental visitations, communications or contributions, and(B) the maintenance of regular contact or communication with the guardianor other custodian of he child.
By his own admission to the DCF social worker in 2000, the respondent is unable to care for Angel. He offers his mother as a resource. The respondent failed to submit to substance abuse assessments, thereby depriving the court of any evidence that he is drug-free. He has failed to visit his son or communicate with him with any regularity or consistency. Although he has not communicated with Angel's foster mother, there is no evidence that he knows who or where she is, or that DCF would divulge this information to him were he to ask for it.
7. Finding regarding the extent to which a parent has been preventedfrom maintaining a meaningful relationship with the child by theunreasonable act or conduct of the other parent of the child, or theunreasonable act of any other person or by the economic circumstances ofthe parent. CT Page 3449
The respondent has not been prevented from maintaining a meaningful relationship with the child by the unreasonable act or conduct of the other parent of the child, or the unreasonable act of any other person. Although the respondent is not financially well off, there is no persuasive evidence that his economic circumstances impaired his maintaining a meaningful relationship with his son.
 2.
Psychological testing of the respondent revealed that he intellectually functions "significantly below the mean." He tends to be emotionally intense and impulsive. He likely suffers from attention deficit disorder. According to Dr. Edgar, the respondent "seems to be working out his relationship with his parents, and still attempting to stabilize his identity as a man." He does not suffer symptoms of depression, anxiety, bizarre thought disorder or unusual aggression.
In her interaction study of the respondent and his son, Dr. Edgar wrote: "There was nothing . . . which would suggest that [the respondent] could definitively not parent Angel. In general, [he] was tender, nurturing and patient with Angel, and [the respondent] exhibited an interest in playful, child based activities." This was not aberrational behavior. Over a year earlier, when the respondent had joined the mother in a visit with all of the children, the social worker wrote in her notes: "Johanna [A.] and her brother Ramon seem to be attached to him. It was very impressive for worker to see Ramon become angry at him the first time he saw him since his placement. After showing his emotion Ramon ran to him and hugged him very hard crying for long time. [Respondent] began to play with him and explained to [social] worker that the two oldest children were always attached to him." Moreover, in 2000, Dr. Edgar found the respondent to be pleasant, cooperative, well groomed and concerned about his son, and involved with his parents' church. She testified that she observed no sign of drug abuse in the respondent at that time.
However, the respondent does not have his own home; he is a middle aged man living with his parents for nearly three years. More importantly, his visitation with his son has been infrequent and sporadic. By refusing to submit to substance abuse assessments, he has deprived the court of the ability to confirm his out of court statements that he is drug free. Finally, and significantly, he failed to even appear in court even though he had actual notice of the trial. Although "[t]he psychological testimony from professionals is rightly accorded great weight in termination proceedings"; In re Nicolina T., 9 Conn. App. 598, 605,520 A.2d 639, cert. denied, 203 Conn. 804, 525 A.2d 519 (1987); the credibility of expert witnesses and the determination of what is in the CT Page 3450 child's best interests is ultimately a matter for the court. In reSavanna M., supra, 55 Conn. App. 816. "[T]he trial court need not and should not blindly adopt that person's view, as the respondent appears to suggest." In re Tricia A., 55 Conn. App. 111, 115, 737 A.2d 974 (1999). Notably, Dr. Edgar stated that the respondent's "account of his history seemed inconsistent at times" and that if the respondent "cannot support his statements that he has been substance free and employed for a significant period of time, there might be a strong argument that [he] should not be further considered as a parental figure for Angel." (Exhibit 7i, pp. 7-8).
DCF's proposed plan, as represented at trial, is to place Angel with the respondent's parents in New York if an interstate compact study concludes that their home is appropriate. See General Statutes §17a-175. This may be accomplished, and the child adopted by his grandparents, even if the respondent's parental rights are terminated. Such a placement would enable Angel to enjoy his father's affection if his father resided with his parents. However, if the paternal grandparents' are either unwilling to care for Angel — as the grandmother was in 1998 — or if their home is not appropriate, Angel must be placed in a preadoptive home. As Dr. Edgar observed on May 9, 2000, it is "of critical importance that Angel be placed as quickly as possible in a potentially permanent placement setting." (Ex. 7k, p. 3) "[L]ong-term stability is critical to a child's future health and development. . . ." In re Eden F., 250 Conn. 674, 709, 741 A.2d 873
(1999). Angel is sufficiently young and his problems not so severe that his chances of being adopted are good.[13]
At three years of age, Angel requires affection, a permanent placement and a consistent psychological parent. When he is present the respondent provides Angel with affection; he clearly cannot provide him with permanency and consistency. By clear and convincing evidence, the court finds that it is in Angel's best interests that the respondent's parental rights be terminated.
 IV (Ramon A.)
DCF seeks to terminate the parental rights of Ramon A. (Sr.), the father of Joanna A., Ramon A., Ashley A. and Stephanie C. on the grounds that he has abandoned them and has no ongoing parent-child relationship with them. At all times since 1997, the whereabouts of Ramon has been unknown. The only possible contact with him has been when a main claiming to be Ramon A. (Sr.) made one "fast and brief call to DCF to inquire of his children, but [he] has refused to come to the DCF office and did not call again. Mr. [A.] has not come forward to offer a plan to provide care and supervision of his children." (Exhibit A: Social Study for the CT Page 3451 Termination of Parental Rights, July 20, 1999, p. 5) In his one fleeting contact with DCF he did not divulge his telephone number or his address. (Id., p. 14) Ramon A. (Sr.) was served with the petitions for termination by publication in the Connecticut Post. He was defaulted by the court on January 5, 2000.
DCF has diligently searched for Ramon A. (Sr.). The search revealed that he had received city welfare in Bridgeport and Norwalk in the past. The court finds by clear and convincing evidence that DCF has used reasonable efforts to locate him. Since his whereabouts have continuously been unknown, the court finds by clear and convincing evidence that he has been unable or unwilling to benefit from reunification efforts.
"Abandonment focuses on the parent's conduct. . . . A lack of interest in the child is not the sole criterion in determining abandonment . . . General Statutes [Rev. 1999] § 17a-112 (b)(1) defines abandonment as the failure to maintain a reasonable degree of interest, concern or responsibility as to the welfare of the child. . . . Attempts to achieve contact with a child, telephone calls, the sending of cards and gifts, and financial support are indicia of interest, concern or responsibility for the welfare of a child. . . . Abandonment occurs where a parent fails to visit a child, does not display love or affection for the child, does not personally interact with the child, and demonstrates no concern for the child's welfare. . . .
"Section 17a-112 (b)(1) [Rev. 1999] does not contemplate a sporadic showing of the indicia of interest, concern or responsibility for the welfare of a child. A parent must maintain a reasonable degree of interest in the welfare of his or her child. Maintain implies a continuing, reasonable degree of concern." . . .
"The commonly understood general obligations of parenthood entail these minimum attributes: (1) express love and affection for the child; (2) express personal concern over the health, education and general well-being of the child; (3) the duty to supply the necessary food, clothing, and medical care; (4) the duty to provide an adequate domicile; and (5) the duty to furnish social and religious guidance." (Citations omitted; internal quotation marks omitted.) In re Deana E., supra, 61 Conn. App. 193.
By clear and convincing evidence the court finds that Ramon A. (Sr.) has abandoned his children for many years.
DCF also seeks to terminate Ramon's parental rights on the grounds that there is no ongoing parent-child relationship between Joanna, Ramon, Ashley and Stephanie and their father, and that it would be detrimental CT Page 3452 to the children's best interest to allow time for such a relationship to develop. See In re John G., supra, 56 Conn. App. 22-23. The social study in support of the petitions, which is in evidence, states that the children have no positive memories of or feeling for their father and do not acknowledge him as their father. By clear and convincing evidence the court finds that there is no ongoing parent-child relationship between Ramon A. (Sr.) and any of his four children and that it would be detrimental to the children's best interest to allow time for such a relationship to develop.
The court finds by clear and convincing evidence that it is in the children's best interests that the parental rights of Ramon A. (Sr.) be terminated.[14]
 IV
The petitions are dismissed as moot with respect to the respondent Joanna C. The petitions are granted as to the respondents Ramon A. (Sr.) and Edgar R. Their parental rights are hereby terminated. The Commissioner of Children and Families is appointed statutory parent for all the children. The commissioner shall file with this court no later than 90 days following the date of this judgment a written report of efforts undertaken to effect a permanent placement for the children and shall file further reports as are required by state and federal law.
Dated at Middletown this 14th day of March, 2001.
BY THE COURT
Bruce L. Levin, Judge of the Superior Court