MEMORANDUM OF DECISION
December 15, 1999, the Department of Children and Families (DCF) brought these petitions to terminate the parental rights of Elizabeth G. and William B. to three minor children, William, Windel, and Maeka.[2]
As grounds for terminating each respondent's parental rights, DCF alleges that:
 • The respondent mother has no ongoing parent-child relationship with any of her children, and has failed to rehabilitate herself so that she could assume a responsible position in their lives. CT Page 10956-a • The respondent father William B. has abandoned all three children, has no ongoing parent-child relationship with them, and failed to rehabilitate himself.
The respondent mother does not seriously dispute that she has failed to rehabilitate herself or even that, on the facts, of this case, termination of her parental rights is in the best interest of the three children. Instead, she raises two separate legal challenges to the proceeding. First, she claims that DCF, by not providing a 24-hour supervised residential living facility for herself and her children, violated the Americans with Disabilities Act, 42 U.S.C. § 12131 et. seq., and amendment twenty-one to the Connecticut Constitution of 1965. Secondly, she claims that the statutory criterion for the dispositional phase of a termination proceeding, whether severance of parental rights is in the best interest of the child, is unconstitutionally vague. For the reasons stated below, the court rejects these claims and grants the petitions.
As whereabouts of the respondent father was unknown when DCF filed the termination petitions, on January 28, 2000, DCF moved for an order of notice of the termination proceedings by publication in the HartfordCourant, which motion the court, Conway, J., that day granted. On February 24, 2000, the court, Cohn, J., confirmed service on Mr. B. by publication on February 10, 2000, in accordance with that earlier order. The court finds that such notice was proper and adequate under the circumstances here. Mr. B. has never appeared in this proceeding. No counsel was appointed to represent him, and he did not attend the trial of this matter.
The trial of this case was held before this court over four days in October and November 2000. The respondent mother was represented by her attorney and appeared personally and through her guardian ad litem[3]
for all days of the trial. The petitioner and the minor children were represented by their respective counsel throughout the proceeding.
The petitioner called the following as its witnesses at trial: Dr. David Krulee, M.D., who conducted a psychiatric examination of the respondent mother and testified as an expert on child, adolescent, and adult psychiatric issues; Kathryn Finale, a nurse clinician at the Connecticut Mental Health Center (CMHC); Gloria F., foster mother for the minor children; Deidra Popkin, a licensed clinical social worker who testified as an expert on child emotional development and adult CT Page 10956-b psychiatric issues; Melanie Clark, formerly assistant director of the Frank Street Project (FSP) in New Haven, a residential program for homeless people with dual diagnoses of substance abuse and mental illness; Christina Podgwaite, a case manager for the state Department of Mental Retardation (DMR); and two DCF social workers, John Kuzmech and Natalia Rodriguez. DCF also introduced into evidence 23 documentary exhibits. The respondent mother offered no testimony from any witnesses but introduced into evidence ten documentary exhibits.
On the first day of trial, Ms. G. moved to dismiss the petition on the grounds that the "best interest of the child" criterion set forth in General Statutes § 17a-112 (d) for terminating parental rights is, in light of In re Quanitra M., 60 Conn. App. 96, 102, ___ A.2d ___, cert. denied, 254 Conn. 903 (2000), unconstitutionally vague. With agreement of all parties, the court deferred decision on the motion to dismiss until after the conclusion of evidence and submission of briefs by other parties in response to the respondent's motion. Thereafter, the court also requested briefing on questions raised in the respondent's closing argument;[4] the last of the briefs on these questions was filed with the court on May 4, 2001, after which the case was submitted to the court for decision.
The court finds that the Child Protection Session of the Superior Court for Juvenile Matters has jurisdiction over the pending matter. The court finds that proper service has been made on all parties. No action is pending in any other court affecting custody of these children.
 I — FACTUAL FINDINGS
The court has carefully considered the verified petition, all of the evidence, including the social study and other exhibits, and the testimony presented, according to the standards required by law.[5]
Upon such consideration, the court finds that the following facts were proven by clear and convincing evidence at trial, as well as additional facts included in later sections of this decision.
A. PROCEDURAL HISTORY
In June of 1997, Ms. G. left her home in Springfield, Massachusetts, with her three children as the result of domestic violence against her by her boyfriend. (Pet. ex. no. 18 at 2.) After that she lived in various shelters for victims of domestic violence until July 25, 1997, when DCF took temporary custody of the three children pursuant to General Statutes Section 17a-101g (c).[6] DCF simultaneously filed neglect petitions and CT Page 10956-c applications for Orders of Temporary Custody (OTC) as to each child claiming the respondent mother was homeless, providing inadequate supervision for her children, and was possibly physically abusing them. The court takes judicial notice of the contents of its own files and finds that on July 25, 1997, the court, Jones, J., issued ex parte OTCs to DCF for all three children. On November 13, 1997, the court, Jones,J., adjudicated all three children to be neglected, committed them to DCF for one year, and ordered expectations[7] for the respondent to follow. At a hearing on extension of this commitment on October 14, 1998, the court, Alander, J., ordered specific steps that the respondent should follow.[8]
 B. THE RESPONDENT MOTHER
 1. Background
There was limited evidence introduced about the respondent's background. Several reports introduced into evidence stated that Ms. G. did not report dates, times and events in her past accurately. (See, e.g., pet. ex. nos. 22 at 2; 19 at 4.) As a child she was a special education student. She attended Conard High School in West Hartford and told several professionals who interviewed her in conjunction with this case that she dropped out of high school but then returned and graduated in 1985. (See, e.g., pet. ex. no. 22 at 2.) She tried several trades but was unsuccessful at pursuing a gainful occupation. Id. DCF has been involved with her family since February 1995. (Pet. ex. no. 22 at 15.) The present case began when DCF removed William, Windel, and Maeka from Ms. G.'s custody as described above. Shortly afterward, she was hospitalized because of auditory hallucinations and suicidal and homicidal ideation. She has repeatedly told the various professionals whose reports were introduced into evidence that these 1997 events leading to her hospitalization were the first time she had experienced psychiatric problems. (See e.g., pet. ex. nos 18 at 2; 22 at 3.)
2. Her mental disabilities
A substantial body of evidence, offered by way of live testimony from witnesses at trial and documents introduced into evidence as exhibits, establishes that three factors prevent Ms. G. from assuming a responsible position in the lives of her children: limited cognitive ability, schizophrenia and other psychotic disturbances, and substance abuse. (Testimony of Dr. Krulee.) The evidence as to Ms. G.'s mental retardation, her mental illness, and their effect on her inability to provide adequate parenting was overwhelming, uncontroverted, and virtually CT Page 10956-d conceded by the respondent. In fact, the respondent's principal defense to the petitioner's allegation of failure to rehabilitate is that DCF failed to provide her with 24-hour supervision to help her care for her children, where someone else would be primarily responsible for raising and caring for the children and the respondent would play a secondary role. The court's decision below summarizes the evidence as to her mental disabilities.
First, she is mildly mentally retarded, has an IQ in the 50-69 level, and functions socially and intellectually at the level of a second or third grader (Testimony of Dr. Krulee), or like a nine-year-old child. (Testimony of Christina Podgwaite.) Because of her limited cognitive abilities, she does not always understand what she is being asked or told. (Id.) When she does not understand what someone has said to her, she does not readily report that lack of comprehension. (Id.) Academically, she has the knowledge and intellectual skills of a second or third grader. (Pet. ex. no. 13 at 1.) Her insight and judgment are poor. (Pet. ex. no. 15 at 6.) Objective psychological testing shows that she functions in the "extremely-low range" of intellectual abilities. When she is in a situation that demands a high level of mental manipulation, divides her attention, or requires continuous mental processing, she has severe difficulty maintaining her attention or staying on task. (Pet. ex. no. 14 at 10.) Those seeking to communicate with her must use simple sentences and concrete language to help her understand what they are saying; but because she has a fair ability to repeat simple statements, those speaking to her should not assume that she understood what they said just because she repeated it. (Pet. ex. 10 at 4 and 5.) Because of significant functional impairment, she requires supervision and personal care services from someone else. She needs assistance from others in arranging transportation, scheduling, budgeting, managing her money, and shopping to meet her needs. (Testimony of Dr. Krulee.)
Second, she has significant psychiatric disabilities: she has heard auditory hallucinations, has had suicidal and homicidal ideations at different times, and is psychotic and schizophrenic. (Testimony of Dr. Krulee.) Dr. David Krulee testified that her mental illness is chronic and psychotic in nature and is best described with a diagnosis of undifferentiated schizophrenia. (Dr. Krulee explained "undifferentiated" schizophrenia to mean that she has no formal "system of delusions." Persons with such diagnoses have a poor prognosis for recovery.) It is characterized by confusion of thought, disorganization in her thinking, and hallucinations. It affects her ability to think clearly and remember things. Although her mental illness is treatable with medications, Ms. G. has not always been willing to stay on her medications. Even when CT Page 10956-e taking medication, moreover, she is not symptom-free. (Id.) Ms. G.'s own mental illness is further characterized by what Dr. Krulee referred to as "prominent negative symptoms," which means a constellation of such symptoms as social withdrawal, lack of motivation and emotional responsiveness, low affect and flattening of energy, lack of eye contact and connectedness with others, and reduced tendency to interact with others. These negative symptoms make it difficult for her to focus on the needs of others, thereby reducing her ability to parent effectively (Testimony of Dr. Krulee) and are clinically associated with a poor prognosis of recovery. (Id.)
Third, she has used marijuana, cocaine, and crack cocaine. She continued to do so during the pendency of the neglect and termination proceedings. On several occasions during the year 2000, while she was being monitored by Connecticut Mental Health Center (CMHC) for drug usage and other reasons, she refused to give a urine sample and missed appointments to give urine samples; the court infers she did so because of continuing substance abuse that she did not want scientifically detected. Ms. G. admitted to her DMR case manager, Christina Podgwaite, on October 11, 2000, that she was still using illegal substances.
Individually and collectively, these three factors prevent her from being able to meet her children's needs or provide them with adequate parenting. A history of the services provided to her by DCF and DMR during this proceeding details the efforts the state has made to assist Ms. G. in addressing these three problems.
After DCF removed William, Windel, and Maeka from Ms. G.'s custody, it referred her to CMHC for clinical and case management services. A clinical assessment conducted at CMHC by psychiatrist Dr. Dori Laub in late August 1997 concluded that she displayed characteristics of mental retardation such as a poor fund of knowledge and impaired memory and he recommended psychological testing. Dr. Laub found her to be depressed and needing "intensive psychotherapy to stabilize her psychiatric symptoms and monitor possible psychosis" and "intensive case management to assist her with finding appropriate living condition and getting her children back." (Pet. ex. no. 15 at 8.) She was scheduled for weekly individual psychotherapy, biweekly medical evaluation, psychological evaluation, and prescribed various medications. (Id; pet. ex. no. 18 at 2.) She missed her first scheduled outpatient appointment. (Pet. ex. no. 18 at 2.)
Ms. G. was at that point living at the Women in Crisis shelter in New Haven. A few weeks later, at the end of October she was apparently living CT Page 10956-f at another shelter for the homeless, Columbus House, which on October 31, 1997, referred her to the Yale New Haven Hospital Emergency Room after she became paranoid and delusional at the shelter and began expressing homicidal and suicidal ideations. She reported hearing auditory hallucinations telling her to "build her grave." (Pet. ex. nos. 18 at 2; 20 at 2.) Yale referred her several days later to CMHC for inpatient treatment. She remained delusional for several weeks but gradually, with medication, the delusions and homicidal and suicidal ideations diminished. CMHC then transferred her to a partial hospitalization day program. She attended the day program only erratically. (Id.) Psychological testing done at CMHC showed her to be at the extremely low range of intellectual functioning and experiencing psychotic symptoms; it recommended further evaluation of her mental condition when her psychotic symptoms had gone into remission. (Pet. ex. no. 18 at 4-6.) The psychological report also noted that her "level of treatment motivation is somewhat lower than is typical of individuals being seen in treatment settings." (Id. at 5.) The report concluded that her "lack of consistent participation is a significant obstacle to treatment. . . ." (Id. at 6.)
On July 26, 1998, she entered the Continuum of Care's Frank Street Project, a residential program providing supervision and treatment for persons with dual diagnoses of mental illness and substance abuse. (Testimony of Melanie Clark; pet. ex. nos. 14 at 1; 27 at 10.) The Frank Street Project (FSP) provided her with housing, case management, support services for her ongoing therapy at CMHC, medication management, substance abuse treatment, and instruction on skills to carry out activities of daily living. While there, she needed assistance with such skills as personal hygiene, laundry, and keeping an apartment clean. The staff there believed that she could not benefit maximally from that program because of her impaired cognitive functioning. (Pet. ex. no. 14 at 2.)
CMHC did further psychological testing in August 1998 after Ms. G.'s psychiatric condition had stabilized. The psychological assessment found that she functioned in the impaired (mentally deficient) range of intellectual abilities, and her daily functional skills also revealed significant impairment. Although she could perform simple tasks relatively well, her performance became severely impaired when the tests made demands on her memory or the complexity of task demanded by the test increased. The assessment team concluded that she "would function best in an environment where some kind of supervision is available for tasks such as managing finances and planning menus." It recommended ongoing monitoring of her parenting skills and style should her children be returned to her custody, as "her difficulties in parenting are likely to be compounded by her intellectual deficits." (Pet. ex. no. 14 at 3-4.) CT Page 10956-g
In December 1998 Dr. David Mantell, Ph.D., conducted a court-ordered psychological evaluation to assess "her probable ability to meet the parenting needs of her children." He also found her to be mildly mentally retarded. At that interview, the respondent initially denied taking any medications or any history of mental illness before later admitting she has schizophrenia and had had hallucinations. Dr. Mantell concluded that "either she does not know she is mentally ill or does not understand the nature of her disorder and how it effects [sic] her." (Pet. ex. no. 17 at 3.) Dr. Mantel also concluded that Ms. G. had a substantially impaired psychological condition with major mental health and cognitive impairments. (Id.) He said it was highly unlikely that "on her own [she] will be able to see to the needs of the children, whether these are average range or exceptional" and that her condition "is not consistent with the children's placement into her care." (Id. at 4.) Dr. Mantell concluded it was unlikely she could be rehabilitated to where she could discharge child care responsibilities on her own, but might be able "in a supportive situation in which persons other than herself were providing primarily for the children" to "play a benevolent secondary role" to the extent not currently impaired by her substance abuse, non-compliance with medications or problems of daily living. (Id.)
While she was living at the Frank Street project, DCF referred Ms. G. to the Coordinating Council for Children in Crisis (CCCC) to participate in a Parenting with a Mental illness Group in November 1998. She attended only five often scheduled group sessions. She occasionally appeared sleepy when attending the sessions. The group leader reported to DCF that her participation in the group "might have been to her fullest extent given what appeared to be speech delays and some cognitive limitation." (Pet. ex. no. 12.) The group leader also told DCF that "there were too many risk factors for [CCCC] to take Ms. G. into more services." (Pet. ex. no. 22 at 13.)
While still at the Frank Street Project, Ms. G. gave birth on January 1999, to a fourth child, Javon. Although she had attended parenting classes there, "she could not articulate what she learned nor demonstrate application of appropriate behaviors." (Pet. ex. no. 31.) In March and April 1999, the New Haven Family Alliance (NHFA) provided her with intensive family preservation services to assess her interaction with the new child and guide her with decision-making. (Pet. ex. no. 13 at 2.) After an NHFA team made four visits to Ms. G. at FSP, it terminated its services to her because Ms. G. did not want to participate in learning parenting skills and saw no need to improve her parenting skills. NHFA CT Page 10956-h staff reported to the DCF worker that "[s]he [had] an answer for everything" when they brought problem areas to her attention. (Pet. ex. no. 27 at 14.)
Since FSP was not funded for people under 18, it could not continue housing her after Javon's birth. FSP staff helped her look for a new place to live. The NHFA social worker strongly advised her not to move to independent living with her infant Javon and recommended instead that she move into supervised apartments run by Home, Inc., but Ms. G. did not want to move to that program, and told FHHA that "she felt she no longer needed any manner of support." Id. (Pet. ex. no. 14 at 2.) NHFA recommended that upon her discharge from FSP, intensive family preservation services be put in place because of "concerns about . . . her ability to care for herself and her infant." (Id.) The NHFA report concluded by recommending for "DCF to continue to monitor this case as Ms. G.'s infant may be at risk without intensive supervision." (Id.)
After Ms. G. obtained a housing certificate and FSP staff had helped her find independent housing, she moved to a rent-subsidized private apartment on May 13, 1999. Melanie Clark, who had been assistant director at FSP while Ms. G. was there and had served as the respondent's case manager, continued providing those services to her for the next six months. After she moved to her own apartment, On Duty Home Care, Inc. provided a daily visiting nurse for five hours of inhome services funded by the Title XIX medicaid program to teach her proper parenting skills and ensure that she took her medications and the baby was safe.[9]
(Pet. ex. no. 27 at 10; testimony of Melanie Clark.)
Within four days after she moved to independent living, however, on May 17, 1999, DCF removed Javon from her custody. (Pet. ex. no. 27 at 10.) On Duty Home Care had reported to DCF earlier that day that "Javon was in imminent danger of immediate harm because of mother's inability to adequately care for the child." (Pet. ex. no. 10 at 2.) Community Health Network, the managed care provider overseeing medical services under the state Title XIX program, had just informed the home care agency that Title XIX would no longer authorize funding for daily inhome services because "if baby were in a safe environment it wouldn't be necessary" to provide such services. (Id.)
The evidence detailed several incidents showing that Javon was not safe in his mother's care:
 • Melanie Clark observed occasions when Javon needed to be changed or fed but Ms. G. would only hold CT Page 10956-i him and not address his crying. FSP staff had to prompt her to feed or change Javon. For example, on one occasion, Javon cried for ten minutes before the respondent, after prompting, changed his diaper; another time, he cried for ten to 15 minutes until, after prompting, she fed him. (Testimony of Melanie Clark.)
 • While the On Duty Home Care worker was at Ms. G's apartment on May 14, 1999, the respondent only said one word the entire time. She left care of the baby totally to the home care worker and slept. (Pet. ex. Nos. 7 at 1; 11 at 1.)
 • On a hospital visit with Javon, Ms. G. placed him on an exam table, where she left him unattended while she fell asleep in a chair. Id.
After Javon's removal from Ms. G.'s care, an In-Home Services team from Boys Village Youth and Family Services, Inc. supervised her weekly visitations with Javon. Although, as noted above, she had previously rejected services from Boys Village while Javon was still living with her, after his removal she became willing to work with the In-Home Services Team so that it could assess her relationship with and care of Javon and help her learn parenting skills and proper techniques. (Pet. ex. no. 7 at 1-2.) Toward that second goal, Boys Village offered her a five-week Parenting Seminar, which she attended and participated in, but her input during the classes showed "that she did not truly understanding [sic] all of the material." Id. Nor did she understand, practice, or master the parenting techniques taught. The team observed her, for example, trying to diaper or change Javon while he was on her lap and at risk of falling off, not using baby wipes to clean him properly, and holding him in an overly reclined position while giving him his bottle, which made it difficult for him to drink. One time the child almost fell off her lap while she was trying to dress him. The in-home team would provide corrective instruction, "along with explaining the potential dangers but she did not seem to retain the information." (Id at 2.) During the supervised visits she would pay attention to the television rather than Javon. The In-Home Services Team concluded after ten sessions that reunification with Javon was not appropriate because she was "not intellectually able or ready to care for him on her own." (Id. at 3.)
On June 3, 1999, the Juvenile Court, Conway, J, ordered a psychiatric examination of Ms. G. to determine her competency. Dr. David Krulee CT Page 10956-j conducted that examination and on October 20, 1999, filed an affidavit with the court concluding that she was not competent because she "lacks the mental capacity to understand the nature of the legal proceedings and to cooperate fully with defense counsel." (Pet. ex. no. 16(b).) In his examination he had found her "seriously impaired by both her psychiatric disorder and her mental retardation." (Pet. ex. no. 16(a) at 5.) He concurred with previous findings of mild mental retardation (Id. at 5-6) and diagnosed her as having "schizophrenia, undifferentiated type, episodic, with interepisode residual symptoms, with prominent negative symptoms."
Thereafter her attorney and GAL both moved for a formal competency hearing. After another competency evaluation conducted by the Yale University — CMHC Law and Psychiatry Division, the court, Conway,J., held a competency hearing and on December 2, 1999, found Ms. G. to be not competent or restorable to competency.
3. Substance abuse
Despite the absence of scientific evidence in the form of chemical tests results indicating the use of marijuana, cocaine, or other illegal substances, or the abuse of alcohol, the evidence firmly established that Ms. G. has had and continues to have a substance abuse problem. She admitted to her DCF social worker, to staff at the Frank Street Project, and to the home health worker sent by On-Duty Home Care that she was still using drugs. Kathryn Finale, the nurse clinician at CMHC who has functioned as Ms. G.'s case manager testified that the respondent has not made any progress in addressing her substance abuse problem. The court finds her conclusion credible. Ms. G.'s frequent refusals to give urine tests to detect substance abuse when requested by CMHC or others (Testimony of Kathryn Finale; pet. ex. nos. 14, 34 and 35), can only be interpreted as an awareness on her part that she would test positive on such tests, as she herself once admitted to Finale. Moreover, in her treatment sessions at CMHC, which was charged with helping her manage her money and monitoring substance abuse, she repeatedly made vague and implausible requests for funds that the court construes as efforts to obtain funds to buy illegal drugs.
4. Effects of her mental disabilities and substance abuse on parenting
Dr. Krulee and Ms. G.'s clinician, Kathryn Finale, offered credible testimony at trial about the effect of Ms. G.'s mental disabilities and substance abuse on her ability to provide adequate parenting. Obviously, continued substance abuse is a grave risk to the safety of children that CT Page 10956-k cannot be countenanced. A parent in a drunken stupor or under the influence of illegal substances will have difficulty keeping her children safe. Schizophrenia moreover, is, in Dr. Krulee's words, a high-risk diagnosis for parents. Confusion and disorganization of thought are characteristic of this illness, which affects one's ability to think clearly or remember things. A parent who cannot remember or think clearly will not be able to meet the needs of children in her care. Although schizophrenia is ordinarily treatable, the nature of Ms. G.'s illness is that even with medication she is not symptom-free. As explained above, she continues to experience "prominent negative symptoms" such social withdrawal, flattened affect, and loss of motivation. Moreover, her continued substance abuse decreases the effectiveness of the medications she takes to control her hallucinations and other psychotic symptoms. (Testimony of Finale.) As a result, as Dr. Krulee testified, there may be times when she will be acutely psychotic, because of noncompliance or the effects of substance abuse. Even under the best of circumstances, the side effects of her medications and the residual negative symptoms will prevent her from providing the nurture, guidance, and stability that children need from their parent. (Id.)
Moreover, Ms. G.'s limited mental faculties further complicate her capacity to provide adequate care for herself or children. She cannot remember much of what she is taught, but does not readily disclose that fact to others. She is not fully aware of the impact of her own disabilities, the effects of her continued substance abuse, or her need for ongoing intensive treatment. She has little insight into how these deficits affect her ability to parent. (Pet. ex. no. 19 at 12.) Functioning herself like a nine-year-old who needs 24-hour supervision to meet her own needs (testimony of Melanie Clark), she cannot manage her own affairs, much less those of her minor children.
The court finds by clear and convincing evidence, and nowhere did respondent's counsel refute, that Ms. G.'s impaired mental capacity resulting from her schizophrenia and mental retardation, and compounded by her continuing substance abuse, would prevent her from meeting the intellectual, emotional, or developmental needs of children in her care.
C. THE MINOR CHILDREN
Each of the three minor children here has special and distinctive needs which the respondent is unable to meet, as the court's discussion below will summarize.
1. William
CT Page 10956-l
William is a child with many problems. He has trouble expressing his feelings, is academically and socially delayed, has significant learning difficulties in school, and has exhibited numerous emotional and behavioral problems. (Pet. ex. no. 19 at 5-6; testimony of Deirdre Popkin and Gloria F.) After removal from his mother's care, William was placed with his siblings in a New Haven foster home. While there he frequently beat up his brother and sister and punched a hole in a wall. He threatened to cut his brother's face with a knife and attempted to put his tongue inside his brother's mouth while kissing him. He said wanted to kill himself. Because of out-of-control behavior in the foster home and at school, he was referred for a developmental assessment at the Hill Health Center (HHC) in New Haven. Examination there revealed a general cognitive index of 53, which corresponds to a mental age of 2 years, 9 months, although he had turned five years old several months earlier.
The Hill Health Center diagnosed him with Attention Deficit Hyperactivity Disorder (ADHD) and began a course of medication on Ritalin and Clonidine, which calmed him for a short period of time, but then his behavior again escalated. HHC referred him to the Yale New Haven Hospital Children's Psychiatric Unit, where he was admitted on December 14, 1997, for evaluation and treatment. Yale recommended placement in a step-down unit until a professional or therapeutic foster home could be located. He was then referred on January 1998 to the Acute Unit of the Klingsberg Family Center, whose Children's Center provided a tightly-supervised highly-structured, 24-hour therapeutic milieu aimed at helping William gain emotional and behavioral stability so that he could make the transition to a therapeutic foster home. While there he received individual and group psychotherapy and a specialized daily tutorial by a special education teacher. While being taught social skills and table manners, he asserted several times that his mother should have been the one to teach him those things. In play therapy he "demonstrated violent themes and was observed to become disorganized in response to frustration." (Pet ex. no. 4 at 2.) With a change in medication to nortriptyline and risperdone, however, his behavior stabilized; during one group meeting, for example, he said that the high point of his day had been that he no longer wanted to kill himself (Pet. ex. nos. 4 and 5.)
A week after his admission to Klingsberg Children's Center, his therapist there, Deidre Popkin, introduced William to Gloria F. as a prospective therapeutic foster mother. (Pet. ex. no. 5 at 3.) and, by month's end, he had been placed in her home. Ms. F. has received extensive and ongoing training on dealing with children with difficulties CT Page 10956-m or special needs. (Testimony of Gloria F.) The Klingsberg Discharge Summary reported "William's delight upon meeting Ms. F. and [that] his attachment to her was instantaneous." (Id.) The Klingsberg staff concluded that some of the stressors leading to Williams' developmental delay and other problems included "deprivation, neglect, maternal psychiatric illness, and chaotic unstable environments with exposure to severe violence." (Id. at 4.) They believed that "[p]rognostically, a nurturing and stable home environment and therapeutic contact with siblings together with ongoing psychiatric treatment and educational evaluation and monitoring . . . William's prognosis is good." (Id.)
Despite that somewhat optimistic prognosis, William continued to have many problems once in the new foster home. He has remained in therapy with Deidra Popkin from the Children's Center. When he first arrived at Ms. F.'s home, he felt suicidal, talked about death, and did things to hurt himself or make himself bleed. He pulled the skin off his fingers and lips and banged his head until he bled. (Testimony of Deidre Popkin.) He is an extremely anxious child who becomes easily stimulated. (Pet. ex. no. 19 at 5.) Although he can be gentle and compassionate in the foster home, he still also exhibits aggressive, destructive, impulsive, oppositional and out-of-control behavior. (Testimony of Ms. F. and Deidre Popkin.) He has trouble concentrating on tasks and demands lots of attention. (Pet. ex. no. 19 at 5.) He gets upset easily if he cannot have his own way or is anxious. At school, he has trouble completing his schoolwork and gets poor grades. He has been in kindergarten for three years. Ms. F. described him at trial as very slow; she testified that she needs to repeatedly tell him what to do. It takes him fifteen to twenty minutes each day to tie his shoes, as he will keep repeating the task until he is satisfied. (Testimony of Ms. F.)
William's acting out behavior, moreover, increases during times of stress or when his routine is varied. He will chew on his clothes or bedding. At trial Ms. F. brought to court and DCF offered as an exhibit a tee shirt in which William had chewed holes. During times of stress he also has episodes of wetting or soiling his bed. His level of stress and aggressive behavior increases after visits with his mother. His therapist testified that William feels out of control and anxious after visits because they remind him of his time living with his mother, pose confusion to him over who his mother is, and lead to anxiety on his part as to whether he will have to resume living with Ms. G. (Testimony of Deidre Popkin.)
William's behavior in the foster home has improved over time, however. (Testimony of Ms. F. and Deidre Popkin.) For example, the nightmares he CT Page 10956-n had every night after he first arrived there now occur less frequently. He is trying to improve his behavior and has had some success in doing so. (Testimony of Ms. F.) For the most part his behavior is now under control and appropriate. Although maternal visits or stress still provoke aggressive activity on his part, he now calms down more quickly. Ms. F. provides structure for him at home by supervising everything he does. Since he does not deal well with interruptions, she tries to prevent them or prepare him for any change in his routine. As Ms. Popkin testified, and the report of Dr. Robert Meier that resulted from his court-ordered psychological assessment of William confirmed, because of his many problems, William needs predictability and structure in his life. He needs permanency in a stable home that will provide structure and systematic attention to his problems. (Testimony of Deidre Popkin; pet. ex. no. 19 at 5.) Ms. F. provides him a predictable, loving, nurturing, and structured environment that has helped William improve his behavior and deal better with stress. Ms. F. has proven herself able to identify and meet his many needs and William has expressed a preference to continue living with her for the rest of his childhood years. (Testimony of Deidre Popkin.)
2. Windel
Windel has also shown developmental delays in communication, activities of daily living, and socialization. (Pet. ex. no. 19 at 8.) In June 1999 DCF moved him to the same therapeutic foster home with Ms. F. where his brother William was residing. He entered therapy with Popkin at the same time. Once in the new foster home, Windel exhibited extreme aggression and was hyper-aggressive. (Testimony of Deidre Popkin and Gloria F.) Seeing someone get hurt, for example, was humorous to him. (Testimony of Gloria F.) Over time, his behavior has improved, though problems with temper, aggression and violence still recur. (Testimony of Gloria F. and Deidre Popkin.) Although an anxious child and somewhat withdrawn, his affect is generally appropriate. (Id; pet. ex. nos. 2 at 1 and 19 at 7.) Academically, he has been placed in special education classes and has repeated the first grade. Diagnosed with ADHD and generalized anxiety disorder, he takes both Ritalin and Noratripline daily. (Testimony of Gloria F. and Deidre Popkin; pet. ex. no. 2 at 1.)
Like William, Windel finds visits with his mother a source of stress. He reacts to that stress with increased aggressiveness towards his siblings and school classmates. He also will have bed-wetting episodes. (Testimony of Gloria F. and Deidre Popkin.)
Windel needs structure and permanency in his living situation. Many of CT Page 10956-o his problems should improve in a structured setting under the guidance of a supportive and reassuring parental figure. (Pet. ex. no. 19 at 7-8.) The foster home of Gloria F. provides him with the stability, structure, consistency, love and support that he needs. (Testimony of Deidre Popkin.) He experiences a sense of confusion and mixed loyalty between the foster mother and his biological mother. After two years in foster care, he also needs consistency — knowing where he will be, and with whom as a parent, now, tomorrow, and for the rest of his childhood years. (Id.)
3. Maeka
Maeka, the youngest of the three children at issue here, was removed from her mother's care when less than a year old. She too has shown aggressive behavior and is in therapy. After an initial placement elsewhere, she was also transferred to Ms. F.'s therapeutic foster home in June 1999. Once in the new foster home, she was aggressive and out of control. The other children in her pre-kindergarten class were all afraid of her. She used extremely vulgar language. Since then, her behavior and aggressiveness have improved in school and the foster home. She still tends to get into fights because of her assertiveness, has a bad temper, and is somewhat impulsive. The foster home of Gloria F. has provided her, like her brothers, with a safe, nurturing, structured and predictable environment. She is responding to the structure and consistent rules and their consequences imposed by Ms. F. Like her brothers, however, she experiences great anxiety when seeing the respondent and her behavior afterward will regress somewhat. She needs structure, consistency and permanency, and she would probably do well in a setting that provided these. (Testimony of Gloria F., pet. ex. nos. 3 and 19 at 8-9.)
 II — ADJUDICATORY DECISION[10]
Trial of a petition to terminate parental rights has two phases, adjudication and disposition. In the adjudicatory phase of the proceeding, the court must make separate determinations as to reasonable efforts and statutory grounds for termination.
A. LOCATION AND REUNIFICATION
Section 17a-112 (j)(1) of the General Statutes requires the court to find whether
 • There is clear and convincing evidence that DCF CT Page 10956-p has made reasonable efforts to locate the parent; and
 • There is clear and convincing evidence that DCF has made reasonable efforts to reunify, the child with the parent, unless the court finds that the parent is unable or unwilling to benefit from reunification efforts. (A finding as to reasonable reunification efforts is not required, however, if the court has determined at a hearing pursuant to subsection (b) of section 17a-110 or section 17a-111b that such efforts are not appropriate.)[11]
The petition alleges here that the department made reasonable efforts to locate the respondent father and to reunite the three minor children with each parent. With respect to the statutory element of location and reunification required for termination pursuant to General Statutes § 17a-112 (j)(1), the court finds as follows:
1. Reasonable efforts to locate
The court finds by clear and convincing evidence that DCF made reasonable efforts to locate the respondent father. The department in fact did locate the respondent father. DCF social worker Kuzmech testified that after he sent the father a certified letter in October 1999, Mr. B. telephoned DCF. Mr. B. agreed to meet with the social worker at the next court hearing but failed to do so. He later called DCF again and told Kuzmech he had moved to Minnesota to look for work but had no address or telephone number at which he could then be reached.
2. Reasonable efforts to reunify
Before trial DCF requested this court to take judicial notice of the court's finding by Dewey, J., on October 27, 1999, that continuing efforts to reunify the children with their parents were no longer appropriate. For the reasons stated in the margin below, this court, on the facts, of this case, declines to do so.[12] This court will thus make its own independent findings as to reasonable reunification efforts.
The evidence at trial clearly and convincingly established that DCF made reasonable efforts to reunify the children with their mother. As has already been recounted above and will be further specified below, DCF offered and referred Ms. G. to a vast array of services and programs to help facilitate her reunion with her three minor children. CT Page 10956-q
To help her recover from substance abuse, DCF referred her to "dual diagnosis" treatment programs that sought to address not only her substance abuse but also her schizophrenia and the interaction between her mental illness and substance abuse, as is necessary and appropriate for persons, such as she, with both these diagnoses. These included referral to the Frank Street House, a dual diagnosis residential program, and to CMHC, where the therapist meeting with Ms. G. treated not just her mental condition but monitored her substance abuse. After she left FSP and moved into her own apartment, her FSP case manager continued to provide aftercare services for her by visiting her weekly, helping her schedule psychiatric and medical appointments, and arranging for other in-home services.
DCF also ensured that Ms. G. received services to address her mental illness. These initial the initial psychiatric and psychological assessments, therapy shortly after DCF had removed William, Windel and Maeka from her custody, in-patient treatment after she become delusional in late 1997, the partial-hospitalization program, residential placement at FSP, and continuing psychiatric and psychotropic treatment thereafter.
Although apparently not contesting that DCF's referrals and services were reasonably appropriate responses to Ms. G.'s substance addiction and her mental illness, counsel for the respondent vigorously contests the adequacy and reasonableness of DCF's efforts to address the respondent's limited cognitive abilities. Throughout trial her attorney sought to elicit testimony that Ms. G. needed to be placed in a residential living facility that would provide 24-hour supervision for her and her children. The respondent argues that with 24-hour supervision of herself and her children in a residential setting, where others bore primary child-rearing responsibility, she could assume a parental role for her children. The evidence established that no such facility currently exists. There was evidence, however, that a program named Community Residences, Inc. (CRI) does run a residential facility providing supervision for mentally retarded adults so that their children can live there with them, but CRI does not provide the 24-hour supervision that the respondent and her children would require.
The respondent argues that, even if no such facility currently exists, DCF is required to provide such a facility under the Americans with Disabilities Act (ADA), 42 U.S.C. § 12131 et. seq., and thetwenty-first amendment to the Connecticut Constitution of 1965. Ms. G.'s limited cognitive abilities and her mental illness undoubtedly qualify as CT Page 10956-r a mental disability under the ADA and amendment twenty-one.[13] The respondent argues, in effect, that the state's statutory duty to make reasonable efforts at reunification imposes an obligation on the state under the ADA and amendment twenty-one to provide a service or program — here, 24-hour residential parenting supervision — that would compensate for Mr. G.'s mental disability and enable her to continue to play a parental role in the life of her children. Prior rulings of our Appellate Court, however, compel a contrary conclusion.
In In Re Antony B., 54 Conn. App. 463, 470 ff, 735 A.2d 893 (1999), the Appellate Court rejected a claim that DCF "failed to comply with its obligations to her under the ADA to offer certain accommodations to [the respondent there] on account of her psychiatric disability." See below,In the Interest of Antony, Superior Court for Juvenile Matters, Child Protection Session (May 21, 1998, Quinn, J.). The Appellate Court held that the ADA does not apply to TPR proceedings and "neither provides a defense to nor creates special obligations in a termination proceeding."In Re Antony B., supra, 54 Conn. App. 472. Similarly, in In Re NicolinaT., 9 Conn. App. 598, 520 A.2d 639 (1987), the Appellate Court rejected a like claim raised under amendment twenty-one. In that case, the court upheld the lower court's ruling that "[c]hronic schizophrenia is not a ground for termination of parental rights. The condition is significant only as it impacts upon the individual's ability to function as a parent." The Appellate Court held that
 [t]ermination is warranted . . . when the parent's mental illness manifests itself in conduct demonstrative of an inability to care for her children. It was the respondent's conduct and relationship to her children, and not her status as a mentally ill person, which predicated the trial court's decision to terminate her parental rights.
Id. at 607.
Even had the Appellate Court not already rejected such claims, or to the extent that Antony B. and Nicolina T. presented somewhat different factual scenarios, the facts of this case would compel this court nonetheless to reject respondent's argument for two separate reasons, discussed below.
At first blush, and in the abstract, this court might agree with the respondent's position that the lack of a currently available residential CT Page 10956-s facility providing 24-hour supervised parenting does not relieve DCF of the obligation to provide such a service. If a particular type of service or program would enable a parent to assume a responsible position in the life of his or her children and meet their needs, then the mere fact that DCF did not currently offer such a service might not preclude DCF from being required to do so. Whether DCF must provide a particular service as part of these reunification efforts depends on whether it was reasonable to do so:
 Before a termination of parental rights can be granted, the trial court must be convinced that the department has made reasonable efforts to reunite the [child with the] family. The term reasonable efforts was recently addressed by this court: Turning to the statutory scheme encompassing the termination of the parental rights of a child committed to the department, the statute imposes on the department the duty, inter alia, to make reasonable efforts to reunite the child or children with the parents. The word reasonable is the linchpin on which the department's efforts in a particular set of circumstances are to be adjudged, using the clear and convincing standard of proof Neither the word reasonable nor the word efforts is, however, defined by our legislature or by the federal act from which the requirement was drawn. . . . [R]easonable efforts means doing everything reasonable, not everything possible. . . . In re Tabitha T., [51 Conn. App. 595, 600, 722 A.2d 1232 (1999)]. . . . In re Antony B., 54 Conn. App. 463, 474-75, 735 A.2d 893 (1999)." (Internal quotation marks omitted.)
In re Savanna M., 55 Conn. App. 807, 812-13, 740 A.2d 484 (1999). In the context of a parent, such as Ms. G., who lost custody of her children because of parenting deficiencies, reasonable efforts to reunify mother and children means providing benefits, services and programs aimed at helping the parent rehabilitate herself so that she could assume a responsible position in the life of her children.
The respondent asserts that where a parent's inability to provide proper parenting results from her mental disability, failure to provide such a 24-hour setting to compensate for the parent's mental disabilities would violate the anti-discrimination clauses of the state ERA and ADA.[14] Nothing in the evidence here shows any discrimination or CT Page 10956-t differential treatment on the basis of disability. To the contrary, the evidence shows the same standard applied to the respondent — whether she is capable of assuming a responsible position in the life of her children — as to any other parent facing a TPR petition on grounds of failure to rehabilitate. Many TPR respondents might be able to function adequately in a secondary parental role if other persons were primarily responsible, on a 24-hour basis, for the care and upbringing of their minor children. This is probably true, for example, of the parent in In re Amelia W., 62 Conn. App. 500, 503, ___ A.2d ___ (2001), whose "serious emotional problems . . . preclude[d] his ability to safely and competently parent his children and understand their individualized needs;" the substance abusing parent in In Re Tyscheicka H.,61 Conn. App. 19, 22, ___ A.2d ___ (2000), who had continued to use drugs and had not yet secured adequate housing; or the alcohol-dependent parent in In Re Amber B., 56 Conn. App. 776, 746 A.2d 222 (2000).
Our courts have long recognized that the statutorily-required degree of personal rehabilitation does not mean that a parent "be able to assume full responsibility for her child, unaided by available support systems."In re Juvenile Appeal (843), 1 Conn. App. 463, 477, 473 A.2d 795 (1984). The statute does require, however, that a parent, either by herself or aided by such support systems, must "be able to assume a responsibleposition" in the child's life, even if the parent cannot be completely fully responsible for all aspects of the child's care and upbringing. A "reasonable modification" would be one that enables a parent to assume such a responsible position. Living in a supervised 24-hour living facility, where staff (a) must oversee the parent's conduct to protect the children from harm caused by parenting lapses by a person with mental disabilities or substance abuse problems, (b) assume the primary child-rearing responsibility, and (c) provide the nurturing and care that such a parent is unable, either occasionally or continuously, to offer her children, and where the parent merely plays a secondary parenting role, does not comport with the statutory requirement that the parent be able to assume a responsible position in the lives of her children, whether for this respondent or for those in such cases as In re AmeliaW., In Re Tyscheicka H., or In Re Amber B. In this respect, this respondent is treated no differently than those in these other cases. A parent who can assume parental roles only in such a facility has not sufficiently rehabilitated herself that she "has gained the ability to care for the needs of the particular child at issue"; In re Sarah AnnK., supra, 57 Conn. App. 448; within the meaning of General Statutes § 17a-112 (1)(3)(B).
None of the evidence here suggests that the respondent will ever be CT Page 10956-u able, under any circumstances, to assume a responsible position in the lives of any of her children. Even if aided by a support system that provided 24-hour supervision of her and the children, she would only be able to have some role in the lives of her children, but could not assume any responsibility for their upbringing, care or nurture. While she surely loves her children, the evidence overwhelmingly demonstrates that she was not able on the adjudicatory date or at the time of trial, and will never be able, to assume any position of responsibility in their lives, even aided by the support system that her counsel proposes. This is particularly true when one considers, as the statute requires, the age and needs of each child.
On the facts of this case, the court finds by clear and convincing evidence that placing any of these three children in such a living environment would be detrimental to the best interest of each of the three minor children. All three children have behavioral and other problems that require a home environment providing them with predictability and structure in their lives. Each child experiences severe stress and their behavior regresses after visits with their mother. William and Windel already have, as their therapist Ms. Popkin explained, severe psychiatric diagnoses, and Maeka is in jeopardy of a psychiatric disorder herself. If they continue to experience stress from the visits with their mother, the severity of their emotional problems will increase. (Testimony of Deidra Popkin.) They each need, for their own individual reasons, permanency in a stable home that provides structure and systematic attention to their problems. (Pet. ex. no. 19 at 5.) Such a sense of permanency may reduce the intensity of their psychological and behavioral problems, and perhaps, over time, eliminate them. (Id.)
A supervised living situation, where any one or more of these three children resided with their mother, but third parties were primarily responsible for the child's care and upbringing, would be, from the perspective of these children, inherently unstable and unpredictable. Those third persons responsible for this primary upkeep, unless family members (and the evidence showed here no family members who could or would assume this responsibility on a long-term basis) would necessarily be paid employees of some other entity. Those caretakers would have lives of their own and would not work twenty-four hours a day, seven days a week, until these children had turned age eighteen. Changes in the staff providing the responsible care would be inevitable. The children would not know, as they need to know, who was going to be their primary caretaker next month, next year, or five years from now. Such a supervised living facility, even if available, therefore, could not possibly provide the CT Page 10956-v consistent, predictable, structured environment that each child needs to overcome his or her problems and grow into emotionally healthy, responsible, and capable members of society. Living in a 24-hour supervised residential facility would not be in the best interest of any of these children. (Testimony of Dr. Krulee.) This court thus finds by clear and convincing evidence that, even if living in the supervised living facility proposed by respondent, she would be unable to assume a responsible position in the lives of any of these children, in view of their ages and needs.
Although the respondent has couched her claim that the state must provide 24-hour residential supervision for her and her children in terms of the ADA and state ERA, this court thus concludes that she has not raised viable claims under either, even when measured under the strict scrutiny standard. She is not being treated differently, or being denied equal protection of the law, because of mental disability. Providing the 24-hour supervised residential living facility for her and her children would not be a "reasonable accommodation" or a "reasonable modification" as it would not enable her to assume a responsible position in the lives of any of her children or meet their needs. As in In Re Nicolina, it is the respondent's conduct and relationship to her children, and not her status as a person with mental disability, that is the basis for terminating her parental rights. She has offered no proof that any service anywhere would ever enable her to assume a responsible position in the lives of her children. The state's obligation to make reasonable modification in its policies and practices, much like DCF's obligation to make reasonable efforts to reunify, does not mean the state must do everything possible. The standard for each is reasonableness. Based on the evidence in this case, it was not reasonable to offer such a service.
The court thus concludes that neither the ADA nor amendment twenty-one require DCF (or DMR) to place the respondent in a 24-hour supervised residential facility as sought by her counsel. DCF and DMR, moreover, provided numerous services to the respondent to help her become able to parent her children adequately. These included parenting classes, in-home visitations, and one-on-one counseling and supervision. The court finds by clear and convincing evidence, therefore, that DCF met its obligation to make reasonable efforts to reunify Ms. G. with her children. The court further finds by clear and convincing evidence that because of Ms. G.'s limited mental capacity, she was unable to benefit from the many services offered to her in such a manner that she could be reunited with the children as a responsible caretaker. As the respondent father has never been involved with his children or met them, and declined to maintain CT Page 10956-w contact with DCF, this court finds by clear and convincing that he was unwilling or unable to benefit from reunification efforts.
B. STATUTORY GROUNDS FOR TERMINATION
To prevail in a non-consensual termination of parental rights case, DCF must also prove by clear and convincing evidence that one of several statutory grounds for termination exists. See In re Michael B.,49 Conn. App. 510, 512, 714 A.2d 1279, cert. denied, 247 Conn. 919,722 A.2d 807 (1998); General Statutes § 17a-112 (j)(3). "In making the adjudicatory determination, the court is limited to considering events preceding the filing of the termination petition or the latest amendment." In re Tabitha P., 39 Conn. App. 353, 367, 664 A.2d 1168
(1995); Practice Book § 33-3(a). In the present case, the petitioner filed the petition for termination of the respondents' parental rights on December 15, 1999. As there have been no amendments to the petition, that date is the adjudicatory date; during the adjudicatory phase of this proceeding this court has accordingly considered the evidence and testimony related to circumstances and events up to the adjudicatory date of December 15, 1999.
1. Failure to Rehabilitate — § 17a-112 (j)(3)(B)[15]
Section 17a-112 (j)(3)(B) of the General Statutes sets forth the statutory basis upon which the Commissioner relies in its petition against the respondent mother. It provides in relevant part:
 The Superior Court . . . may grant a petition filed pursuant to this section if it finds by clear and convincing evidence . . . that . . . the parent of a child who has been found by the Superior Court to have been neglected or uncared for in a prior proceeding has failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, such parent could assume a responsible position in the life of the child
. . . .
The court must determine whether the petitioner has proven, by clear and convincing evidence, that Ms. Elizabeth G. had failed, as of the adjudicatory date of December 15, 1999, to achieve the required degree of personal rehabilitation. CT Page 10956-x
The term "rehabilitation" as used in the statute means "`to restore [a handicapped or delinquent person] to a useful and constructive place in society through social rehabilitation. The statute does not require [a parent] to prove precisely when she will be able to assume a responsible position in her child's life. Nor does it require her to prove that she will be able to assume full responsibility for her child, unaided by available support systems." (Internal quotations omitted; internal citations omitted.) In re Eden F., 250 Conn. 674, 706, 741 A.2d 873
(1999). The statutory terminology "personal rehabilitation" requires the court to focus on the prospect of restoring a parent "to his or her former constructive and useful role as a parent." In re Tabitha P.,39 Conn. App. 353, 361, 664 A.2d 1168 (1995). "What is a reasonable time is a factual determination that must be made on a case-by-case basis" depending on the needs and situation of the particular child. In reShannon S., 41 Conn. Sup. 145, 154, 562 A.2d 79, (1989), aff'd,19 Conn. App. 20, 560 A.2d 993 (1989).
In conducting the inquiry whether the commissioner has established a respondent's failure to rehabilitate by clear and convincing evidence, the trial court must consider:
 • the respondent's rehabilitative status as it relates to the needs of the particular child and
 • whether the prospects for rehabilitation can be realized within a reasonable time given the age and needs of the child. "The statute requires the court to find by clear and convincing evidence that the parent's level of rehabilitation is less than that which would encourage a belief that he or she can assume a responsible position in the child's life within a reasonable time." In re Shyliesh H., 56 Conn. App. 167, 173, 743 A.2d 165 (1999).
"Thus, the trial court's inquiry requires the determination of both the present and past status of the child, and obtaining a historical perspective of the respondent's child caring and parenting." Id.
The crux of the adjudicatory ground of failure to rehabilitate is whether a parent has sufficiently addressed the problems and deficiencies in parenting that led to state intervention in the family so that the parent can, considering the age and needs of the child, assume a responsible position in the child's life, or will be able to do so in the CT Page 10956-y reasonably foreseeable future. As the Appellate Court recently noted inIn re Sarah Ann K., 57 Conn. App. 441, 448 (2000), the critical issue is whether the parent "has gained the ability to care for the needs of the particular child at issue." The evidence overwhelmingly demonstrates, and the court so finds by clear and convincing evidence, that as of the adjudicatory date of December 15, 1999, the respondent mother had not sufficiently rehabilitated herself to the extent that she could then, or in the reasonably foreseeable future, assume a responsible position in the lives of any of these minor children, in light of their ages and needs. The evidence overwhelming showed three factors preventing Ms. G. from assuming a responsible position in the lives of her children: limited cognitive ability, schizophrenia and other psychotic disturbances, and substance abuse.
Because of her limited cognitive abilities, she does not fully understand her own parenting limitations, the effect of those deficits on her children, her own children's needs, or how to meet those needs.[16]
She was thus unable to meet either her own needs or those of her children, either as of the adjudicatory date or in the reasonably foreseeable future.
As Dr. Krulee testified, schizophrenia is a high risk diagnosis for a parent. Untreated, it can lead to active hallucinations and delusions that would prevent a parent from taking care of her children. Compliance with treatment and cooperation with treatment providers are essential for a parent with schizophrenia to be able to care properly for her children. Even when treated with medication, the schizophrenia does not vanish, and while on psychotropic medication an individual with this illness may still experience thought disorders, confused thinking, and limited ability at times to think clearly or remember things. The respondent's dual mental conditions of schizophrenia and mental retardation result in significant deficits in her own stability and preclude her from providing the stability that each of these children needs. In a delusional or hallucinatory state, she may harm herself or her children. Even when not actively psychotic, her "negative symptoms" make it difficult for her to focus on the needs of others. (Testimony of Dr. Krulee.)
Ms. G. has not always been compliant with suggestions from her care givers in the past. She has declined some offers of help. She has continued to abuse substances. The medications she takes for her schizophrenia to control delusions and psychoses are not as effective when an individual is using illegal substances. Ms. G.'s continued substance abuse thus jeopardizes the effectiveness of her anti-psychotic medications and increases the likelihood of active delusions or CT Page 10956-z hallucinations. (Testimony of Dr. Krulee.) That continuing substance abuse alone is a sufficient basis for this court to find by clear and convincing evidence that Ms. G. was not able, as of the adjudicatory date, or any time in the reasonably foreseeable future, to assume a responsible position in lives of any of these three children, in view of their ages and needs.
2. Abandonment — § 17a-112 (j)(3)(A)
The petitioner has asserted, as one of the statutory grounds for terminating the parental rights of the respondent father, that he has abandoned the minor children. Section 17a-112 (j) of the General Statutes provides that "[t]he Superior Court . . . may grant a petition filed pursuant to this section if it finds by clear and convincing evidence . . . (3) that: (A) The child has been abandoned by the parent in the sense that the parent has failed to maintain a reasonable degree of interest, concern or responsibility as to the welfare of the child. . . ." The court must determine whether the petitioner has proven, by clear and convincing evidence, that Mr. William B. had, as of the adjudicatory date, abandoned the three minor children at issue here.
Abandonment "focuses on the parent's conduct. . . . A lack of interest in the child is not the sole criterion in determining abandonment. . . . General Statutes [Rev. to 1995] § 17a-112 (b)(1) [now § 17a-112
(j)(3)(A)] defines abandonment as the [failure] to maintain a reasonable degree of interest, concern or responsibility as to the welfare of the child. . . . Attempts to achieve contact with a child, telephone calls, the sending of cards and gifts, and financial support are indicia of interest, concern or responsibility for the welfare of a child. . . . Abandonment occurs where a parent fails to visit a child, does not display love or affection for the child, does not personally interact with the child, and demonstrates no concern for the child's welfare. . . ." In re Kezia M., 33 Conn. App. 12, 17-18, 632 A.2d 1122
(1993). The statute requires DCF to show by clear and convincing evidence that a parent has failed to maintain a reasonable degree of interest in the welfare of his or her child.
 Maintain implies a continuing, reasonable degree of concern not a sporadic showing of the indicia of interest, concern or responsibility for the welfare of a child. The commonly understood general obligations of parenthood entail these minimum attributes: (1) express love and affection for the child; (2) express personal concern over the health, education and CT Page 10956-ba general well-being of the child; (3) the duty to supply the necessary food, clothing, and medical care; (4) the duty to provide an adequate domicile; and (5) the duty to furnish social and religious guidance. . . .
(Internal quotation marks omitted.) Id.
The court finds by clear and convincing evidence that Mr. B. had, as of the adjudicatory date, abandoned these three children. He has had virtually no contact with them over the last three years. Since William, Windel and Maeka were removed from their mother's care on July 25, 1997, he has never visited with them, sent them cards, gifts, or letters or made phone calls to them. He has not maintained regular contact with DCF. In October 1999, he responded to a certified letter sent to him care of his girlfriend's apartment by telephoning the DCF social worker Kuzmech. He said that he wanted to meet his children and have visitations with them, and agreed to meet with Kuzmech on the next court date. He failed to keep that appointment. He did call back but then had no further contact with DCF until he called in the spring of this year to say he was in Minnesota but did not have a telephone or address there. This is a classic case of abandonment. He has not shown any concern, interest, or responsibility in their welfare. He has had no involvement in their lives, either directly through contact with them, or indirectly through contact with DCF.
3. No Ongoing Parent-Child Relationship — § 17a-112(j)(3)(D)
The remaining statutory ground alleged for termination is the petition's allegation that there is no ongoing parent-child relationship between the respondent mother and father and their children pursuant to General Statutes Section 17a-112 (1)(3)(D). That section establishes an adjudicatory ground for termination of parental rights where:
 there is no ongoing parent-child relationship, which means the relationship that ordinarily develops as a result of a parent having met on a day to day basis the physical, emotional, moral and educational needs of the child and to allow further time for the establishment or reestablishment of such parent-child relationship would be detrimental to the best interest of the child;. . . .
Under this section, the court must "undertake a two-pronged analysis. CT Page 10956-bb First, there must be a determination that no parent-child relationship exists, and second, the court must look into the future and determine whether it would be detrimental to the child's best interest to allow time for such a relationship to develop." In Re John G., 53 Conn. App. 12,22, 740 A.2d 496 (1999). "In considering whether an ongoing parent-child relationship exists, the feelings of the child are of paramount importance. . . . The ultimate question is whether the child has no present memories or feelings for the natural parent." (Citations omitted.)In re John G., supra at 23. This standard contemplates a relationship that has some positive attributes. In re Jessica M., 217 Conn. 459, 470,586 A.2d 597 (1991).
"To satisfy the second prong [of the analysis], the trial court [is] required to determine whether it would be in the child's best interest to allow additional time for the establishment of a parent-child relationship. . . . The `best interest' standard, therefore, does not become relevant until after it has been determined that no ongoing parent-child relationship exists." (Citation omitied.) In re Kezia M.,33 Conn. App. 12, 22, 632 A.2d 1122, cert. denied, 228 Conn. 915,636 A.2d 847 (1993). The factors to be considered in deciding whether it would be in the best interest of a child to permit further time for a relationship with his parent to develop include "(1) the length of stay with the foster parents, (2) the nature of the child's relationship with the foster parents, (3) the degree of contact maintained with the natural parent and (4) the nature of the child's relationship to his or her natural parent." (Id.)
As to the respondent father, there is absolutely no doubt, and the court thus finds by clear and convincing evidence, that there is no ongoing parent-child relationship between Mr. B. and any of these three children. It would be virtually impossible for children of these ages to maintain a parent-child relationship with someone they had not seen or had contact with in almost three years. (Testimony of Dr. Krulee) He has not provided for or met their needs in any significant way during the pendency of this case. In view of the need of each of these three children for permanency and stability now, the court further finds by clear and convincing evidence that it would be detrimental to the best interest of each child to allow further time for such a relationship to develop.
As to the respondent mother, the evidence showed that each child has negative behavioral stress reactions to visits with their mother. (Testimony of Deidre Popkin and Gloria F.) William's episodes of clothes-chewing resume after visits, and he becomes defiant and aggressive. Maeka's vulgar and aggressive behavior escalates after CT Page 10956-bc visits. Windel has nightmares and becomes defiant after visits. The school behavior of all three children also worsens after visits. As a consequence what were monthly visits with their mother in 1999 are now, at the recommendation of the children's therapists, less frequent. (Testimony of Gloria F.) Deidre Popkin, the therapist for William and Windel, even recommended that if this court denies the TPR petition there be no continuing visits between the children and their mother because of their negative behavioral reactions after visits with her. (Testimony of Deidre Popkin.)
The evidence also shows that during her visits with the children, Ms. G. is often rather uninvolved with them. In the 33 visits that Popkin observed, for example, Ms. G. had limited physical or eye contact with the children, other than a hug at the beginning and end of each visit. She was able to focus her attention on them only sporadically during the visits. (Testimony of Deidre Popkin.) Similarly, during the parent-child interaction that Dr. Robert Meier observed, she sat on the couch for most the session, and was not directly involved with the children, who played with each other. One-half hour into that session, she "appeared to get bored, and at a loss about what to say to her children. After just twenty minutes she asked when it would be time to go home." (Pet. ex. no. 19 at 10.)
Both Dr. Meier and Ms. Popkin concluded that neither of the three children had an ongoing parent-child relationship with Ms. G. (Pet. ex. 19 at 10; testimony of Deidra Popkin.) Ms. Popkin testified without objection as an expert on child emotional development and adult psychiatric issues. She is the therapist for William and Windel and has met with them repeatedly. Although not Maeka's therapist, she has direct knowledge of Maeka by supervising the 39 family visitations. She thus has first-hand knowledge of the relationship and interaction between all three children and the respondent. The court found Popkin's testimony and conclusions to be persuasive and sufficient, by itself for the court to find by clear and convincing evidence that there is no ongoing parent-child relationship between Ms. G. and the three minor children in issue here and that to allow further time for such a relationship to develop would be detrimental to each of these children. Her testimony was internally consistent, in accord with the other evidence, and credible. Although the question of ongoing parent-child relationship is not one exclusively of psychological dimension, her assessment that it would be detrimental to these three children, because of their psychological and behavioral problems, to allow continued visits with their mother, relies on her professional expertise. Ms. Popkin also based her conclusion as to the lack of ongoing parent-child relationship on the minimal contact Ms. CT Page 10956-bd G. and children for the last two and a half years, the effect of such contact on each of the children, the regard of the three children for their foster mother as their psychological parent who cares for and meets their needs, and the children having no positive feeling toward or connection with Ms. G.
Dr. Meier based his conclusion as to no ongoing parent-child relationship on the minimal interaction between Ms. G. and her children during the evaluation session and the lack of emotional or affectional intensity they exhibited toward her. As Dr. Meier did not testify, and his report was introduced as a business record, his conclusions were not subject to cross-examination and the court lacked the opportunity to observe and weigh his testimony. His conclusions are completely consistent, however, with the testimony and conclusions of Ms. Popkin.
This court thus finds, by clear and convincing evidence, based on the expert opinion of Ms. Popkin, as corroborated by Dr. Meier's written report, plus the court's own review and consideration of the entire evidence, that there is no present ongoing parent-child relationship of a positive nature between any of these children and Ms. G. The court further finds by clear and convincing evidence that to allow more time for such a relationship to develop would be detrimental to the best interest of each of these children.
 III — DISPOSITION
"A hearing on a petition to terminate parental rights consists of two phases, adjudication and disposition. . . . If the trial court determines that a statutory ground for termination exists, it proceeds to the dispositional phase. In the dispositional phase, the trial court determines whether termination is in the best interests of the child." (Citation omitted; internal quotation marks omitted.) In re Roshawn R.,51 Conn. App. 44, 52, 720 A.2d 1112 (1998). In making the dispositional decision in a non-consensual case, "the court is mandated to consider and make written findings regarding seven factors" specified in General Statutes § 17a-112 (k).[17] In re Tabitha P., 39 Conn. App. 353,664 A.2d 1168 (1995). Unlike the adjudicatory phase, on disposition the court may consider information through the close of the evidentiary hearing. Practice Book § 33-5. In the dispositional phase of this case, the court has considered the evidence and testimony related to circumstances and events up to and including October 18, 2000, the date upon which the evidence in this matter was concluded.
A. MOTION TO DISMISS
CT Page 10956-be
The court must first consider the motion to dismiss filed by the respondent mother. That motion claims that the statutory criterion for the dispositional phase — whether termination is "in the best interest of the child" — is unconstitutionally vague. Ms. G. raises this claim in light of In re Quanitra M., 60 Conn. App. 96 (2000), cert. denied 255 Conn. 903 (2000), where the court held that DCF need not prove the seven dispositional factors set forth in General Statutes § 17a-112
(k) by clear and convincing evidence. If the seven dispositional factors need not be proven by clear and convincing evidence, then she claims the statutory criterion of "best interest of the child" is void for vagueness both on its face and as applied to her.
In considering a challenge to a statute as unconstitutional, the court proceeds first "from the well recognized jurisprudential principle that `[t]he party attacking a validly enacted statute . . . bears the heavy burden of proving its unconstitutionality beyond a reasonable doubt and we indulge in every presumption in favor of the statute's constitutionality. . . ." (Citation omitted.) State v. Ross, 230 Conn. 183,236, 646 A.2d 1318 (1994). The void-for-vagueness doctrine "embodies two central precepts: the right to fair warning of the effect of a governing statute or regulation and the guarantee against standardless law enforcement." State v. Gurreh, 60 Conn. App. 166, 175, ___ A.2d ___ (2000), cert. den. 255 Conn. 916 (2000).
In a termination of parental rights proceeding, however, the adjudicatory phase of the proceeding focuses on the parent's conduct. The respondent does not challenge the adjudicatory portion of the statute, which specifies seven different conduct-based criteria that may be the basis for an adjudicatory finding. Instead, the respondent focuses on the "best interest" standard used in the dispositional phase. Thus, any claim that this statute is unconstitutional for not giving fair notice of prohibited conduct is not an issue here. Similarly, the argument that a vague statute may cause people to "steer far wider" than constitutionally necessary of the impermissible conduct; Grayned v. City of Rockford,408 U.S. 104, 109; does not apply — since that standard also applies to the conduct of people, and the dispositional focus is not a conduct-based inquiry. Thus the only fair consideration is whether the best interest of the child criterion is standardless or delegates too much discretion to the courts on an ad hoc and subjective basis. To withstand a vagueness challenge, a statute must provide a standard with sufficient clarity and boundaries for the law to be fairly administered:
 the vagueness doctrine requires that statutes CT Page 10956-bf establish minimum guidelines to govern their enforcement. . . . "[I]f arbitrary and discriminatory enforcement is to be prevented, laws must provide explicit standards for those who apply them. A vague law impermissibly delegates basic policy matters . . . for resolution on an ad hoc and subjective basis, with the attendant dangers of arbitrary and discriminatory application." Grayned v. Rockford, supra. 408 U.S. 108-109; State v. Indrisano, supra, 803. "[V]ague laws defeat the intrinsic promise of, and frustrate the essence of, a constitutional regime. We remain `a government of laws, and not of men,' Marbury v. Madison, 5 U.S. (1 Cranch.) 137, 163 101 [1803], only so long as our laws remain clear." (Internal quotation marks omitted.) Mesquite v. Aladdin's Castle, Inc., 455 U.S. 283, 290 n. 12, 102 S.Ct. 1070, 71 L.Ed.2d 152 (1982).
Packer v. Board of Education, 246 Conn. 89, 100-101, 717 A.2d 117 (1998).
The respondent here mounts both a facial and as-applied attack on the best interest standard. In a void-for-vagueness challenge to a statute, a court ordinarily must look to the constitutionality of the statute as applied to the facts of that case except where the statute might chill conduct protected by the first amendment to the United States Constitution. In such cases as Ramos v. Town of Vernon, 254 Conn. 799,844, 761 A.2d 705 (2000), and State v. Wilchinski, 242 Conn. 211, 216,700 A.2d 1 (1997), the Connecticut Supreme Court has suggested, without deciding, that a facial analysis might also apply to claims that a statute infringes on a fundamental right, such as here, the constitutional sanctity of the family relationship. See e.g., Moore v.East Cleveland, 431 U.S. 494 (1977).
The reason for the first amendment exception to the general principle that one cannot challenge a statute that is not vague as applied to his or her conduct is the concern that "persons whose expression is constitutionally protected may well refrain from exercising their rights for fear of criminal sanctions by a statute susceptible of application to protected expression." (Internal quotation marks omitted.) New York v.Ferber, 458 U.S. 747, 768 (1982). The same concern would seem to be true for the exercise of other fundamental rights, but as our appellate courts have not yet provided definitive guidance on this question, this court will consider the statute both on its face and as applied to the facts here. CT Page 10956-bg
In analyzing the constitutionality of a statute, the court will "read the statute narrowly in order to save its constitutionality, rather than broadly in order to destroy it." State v. Indrisano, 228 Conn. 795, 805,640 A.2d 986 (1994). In considering whether a statute is facially void for vagueness, the court must interpret it in light of prior judicial opinions construing the statute.
 Further, in evaluating the defendant's challenge to the constitutionality of the statute, we read the statute narrowly in order to save its constitutionality, rather than broadly in order to destroy it. We will indulge in every presumption in favor of the statute's constitutionality. . . . In so doing, we take into account any prior interpretations that this court, our Appellate Court and the Appellate Session of the Superior Court have placed on the statute. The rule of federal vagueness jurisprudence is that prior judicial decisions interpreting a state statute are authoritative if they are decisions of a court of statewide jurisdiction, the decisions of which are binding upon all trial courts in the absence of a conflicting decision of the [state] Supreme Court. . . .
(Internal quotation marks omitted; internal citations omitted.) Id. at 805. Moreover, "[i]f the meaning of a statute can be fairly ascertained a statute will not be void for vagueness since [m]any statutes will have some inherent vagueness, for [i]n most English words and phrases there lurk uncertainties. . . . References to judicial opinions involving the statute, the common law, legal dictionaries, or treatises may be necessary to ascertain a statute's meaning to determine if it gives fair warning." (Internal quotation marks omitted.) State v. Payne,240 Conn. 766, 778, 356 695 A.2d 525 (1997).
Applying these principles to the statute in question, there is no doubt that the term "best interest of the child" does not have scientific precision. Our Supreme Court has noted, for example, that while this standard "does not have a precise meaning, it does not lack metes and bounds." State v. Anonymous, 179 Conn. 155, 165,425 A.2d 939 (1979). As the court noted in that case, moreover, "[s]tandards of mathematical precision are neither possible nor desirable in this field; much must be left to the trial judge's experience and judgment." Id., citing Petition of the New England Home for LittleWanderers, 367 Mass. 631, 646, CT Page 10956-bh328 N.E.2d 854 (1975).
In view of the gravity of the stakes in a termination proceeding, the complete severance of family ties between parent and offspring, the legislature has adopted a phrase that "is purposefully broad to enable the trial court to exercise its discretion based upon a host of considerations." In Re Bruce R., 234 Conn. 194, 206, 662 A.2d 107
(1995). What is clear from the statute and cases construing it, however, is that in deciding whether to terminate parental rights, "the primary focus of the court is the best interest of the child, the child's interest in sustained growth, development, well-being, and in the continuity and stability of its environment." Capetta v. Capetta,196 Conn. 10, 16, 490 A.2d 996 (1985). A statutory standard sufficient to warrant termination of that relationship properly gives the court discretion to consider a wide range of factors that might affect the welfare and best interest of the child; such a standard must necessarily be general in order to allow a court to consider all the different and individualized factors that might affect a specific child's welfare.
The appellate courts of this state have never considered precisely the question raised here — whether the best interest of the child standard is void for vagueness when used as the statutory criterion for the dispositional phase of a termination proceeding. In the custody context, however, where General Statutes § 46b-56 (B) makes the best interest of the child the primary criterion for determining custody disputes, our Supreme Court expressly rejected the contention
 that the custody statute's failure to provide guidelines for the exercise of the trial court's discretion makes the statute unconstitutionally vague. . . . We continue to adhere to the view that the legislature was acting wisely in leaving the delicate and difficult process of fact-finding in family matters to flexible, individualized adjudication of the particular facts of each case without the constraint of objective guidelines has held that the best interest standard.
Seymour v. Seymour, 180 Conn. 705, 709-710, 433 A.2d 1005 (1980).
The same analysis is applicable to the termination context. For a termination proceeding to have reached the dispositional phase, a court must already have found, by clear and convincing evidence, that conduct of the parent warrants termination of his or her parental rights. As a CT Page 10956-bi further protection of the familial interest, the statute also requires the court to consider whether severance of that relationship, even if justified by the parent's conduct, would be detrimental or beneficial to the child. In view of the many different factual contexts that present themselves in termination cases, and the constitutional magnitude of the interests involved, the "best interest of the child" standard appropriately directs, and permits, the court to consider whatever factors are appropriate for that child's well-being. As the District of Columbia Court of Appeals stated nearly one-quarter century ago rejecting an identical challenge, "[w]e think it is plain that the standard `best interest of the child' requires the judge, recognizing human frailty and man's limitations with respect to forecasting the future course of human events, to make an informed and rational judgment, free of bias and favor, as to the least detrimental of the available alternatives. No more precision appears possible. In this context, no more is constitutionally required." Matter of Adoption of J.SR., 374 A.2d 860, 863 (1977).
Moreover, the seven dispositional factors that the respondent claims should be proven by clear and convincing evidence for the "best interest of the child" standard to pass constitutional muster do not all pertain to the best interest of the child. The first three factors (the timeliness, nature and extent of services provided to facilitate reunification; whether DCF made reasonable efforts to reunite the family; and whether the parties complied with applicable court orders) and the last two (efforts made by the parent to adjust circumstances, conduct, or conditions to make it in the best interest of the child to return home in the foreseeable future; and whether unreasonable acts of others or the parent's financial circumstances prevented the parent from maintaining a meaningful relationship with the child) focus more on the relationship between DCF and parent than on the child's best interest. It is almost meaningless to speak of having to prove another of the factors, the child's age, by clear and convincing evidence. Thus, of the seven dispositional factors, only the fifth one (the feelings and emotional ties of the child with respect to his parents, any guardian, and person who has exercised physical care, custody or control of the child for at least one year and with whom the child has developed significant emotional ties) is directly tied to the best interest of the child. Requiring the seven statutory findings to be proven by clear and convincing evidence would add little definitiveness to the best interest standard.
As Judge Conway noted in her well-reasoned opinion rejecting the identical contention raised here that the best interest standard is void for vagueness because the Quanitra court held that seven statutory CT Page 10956-bj findings need not be proven by clear and convincing evidence:
 the appellate court had no difficulty in In re Alissa N. in determining how the seven guidelines and the "best interest" finding are to be intermingled. "These [seven] factors, combined with the broad concept of the best interest of the child, establish the proper factors to be considered in the dispositional phase of a nonconsensual parental termination proceeding."
(Citation omitted.) In the interest of Angel B. and Christopher B., Superior Court for Juvenile Matters at New Haven, docket number N05-CP98-010481-A (May 8, 2001). This court concurs, and concludes that the best interest of the child standard is not, on its face, unconstitutionally vague and provides adequate, minimum guidelines for fair enforcement of the statute.
Finally, this court notes that respondent's counsel virtually conceded in his summation that the evidence here established that termination of Ms. G's parental rights was in the best interests of these three children: "The testimony has indicated that it is not in the best interest of these three children to be returned to the mother and everyone who has come up to testify has testified to that fact. Counsel will not get up here and claim otherwise." The court moreover finds that, as applied to these children, there is absolutely no doubt in the world that it is in their best interest to sever the respondent mother's parental rights. The many problems of these children, the inability of their mother to meet their needs, the severe stress and behavioral reactions they experience after visits with her, the significant risk that continued contact with her will exacerbate their psychological problems, the improvement in their behavioral and psychological problems under the care of the foster mother, their psychological bonding with the foster mother, and a host of other factors all dictate that their best interest requires termination of their mother's parental rights. This court therefore concludes that the best interest of the child standard, even shorn of any necessity to prove the seven statutory factors by clear and convincing evidence, passes constitutional muster, both on its face and as applied to the facts of this case. Accordingly, the motion to dismiss is denied.
B. REQUIRED STATUTORY FINDINGS
The court makes the following written findings, as required by General Statutes § 17a-112 (k). The court has considered these factors and CT Page 10956-bk its findings in determining whether it is the best interest of each of these three children to terminate the parental rights of the respondent.In re Quanitra M., 60 Conn. App. 96 (2000), cert. denied 255 Conn. 903
(2000).
 (1) The timeliness, nature and extent of services offered, provided and made available to the parent and the child by an agency to facilitate the reunion of the child with the parent — § 17a-112 (k) (1)
As discussed above, the court finds that DCF offered Ms. G. and referred her to a vast array of services and programs. These included psychological and psychiatric evaluations to determine her mental condition and capacity, referrals for dual diagnosis mental health and substance abuse treatment, parenting classes and one-on-one parenting instruction and supervision, and referral to DMR and numerous programs for people with mental retardation. No services were offered to the respondent father, as he absented himself from the children and DCF.
 (2) Whether the Department of Children and Families has made reasonable efforts to reunite the family pursuant to the federal Adoption Assistance and Child Welfare Act of 1980, as amended — § 17a-112 (k) (2)
As discussed extensively above, the court finds that DCF made reasonable efforts to reunite the family pursuant to the federal Adoption Assistance and Child Welfare Act of 1980, as amended.
 (3) The terms of any applicable court order entered into and agreed upon by any individual or agency and the parent, and the extent to which all parties have fulfilled their obligations under such order — § 17a-112 (k)(3).
No court orders were entered with regard to the respondent father. The court twice entered orders of Expectations for Ms. G; see footnotes seven and eight above. During the pendency of this case, Ms. G. complied with the court's orders that she sign releases as requested; secure and maintain adequate housing and income; keep her whereabouts known; cooperate with home visits by DCF, her attorney, and her children's attorney; sign releases authorizing DCF to communicate with service providers; have no further involvement with the criminal justice system; CT Page 10956-bl and visit the children as often as permitted by DCF. The evidence did not disclose whether she kept all appointments made by or with DCF.
As described above, she participated in parenting classes and individual counseling but did not make satisfactory progress toward the identified treatment goals. She did not successfully complete substance abuse treatment. Although she continued receiving therapy services from CMHC, she missed some sessions there and did not follow its recommendations for drug tests and to stop using illegal substances. She went to most programs that DCF and service providers referred her to, but because of her limited cognitive abilities, was unable to comply with recommendations and instructions from service provides on how to modify her conduct. so that she could care for her children properly. She only partially complied with the court's order that she continue with supportive housing and follow recommendations. She went to Frank Street Place when referred there. When she had to leave that facility, however, she rejected the "strong" recommendation that she move to a supervised apartment and instead moved into her own apartment.
 (4) The feelings and emotional ties of the child with respect to his parents, any guardian of his person and any person who has exercised physical care, custody or control of the child for at least one year and with whom the child has developed significant emotional ties — § 17a-112 (k)(4)
None of these three children any longer has a close emotional tie to the respondent mother or father. The foster parent, Gloria F., has become the psychological parent for all three, in the sense that they look to her for their day-to-day care and nurture and to meet their needs.
(5) The age of the child — § 17a-112 (k)(5)
William, born on June 1992, is nine years old. Windel, born on June 1993, is eight years old. Maeka, born on November 1996, is four and three-quarters years old.
 (6) The efforts the parent has made to adjust his circumstances, conduct, or conditions to make it in the best interest of the child to return him to his home in the foreseeable future, including, but not limited to, (A) the extent to which the parent has maintained contact with the child as part of an effort to reunite the child with the parent, provided theCT Page 10956-bm court may give weight to incidental visitations, communications or contributions and (B) the maintenanc of regular contact or communication with the guardian or other custodian of the child — § 17a-112 (k)(6)
Ms. G. made many efforts to adjust her circumstances, conduct and conditions to make it in the best interest of her children to return to her home. She maintained contact with the children as often as directed by DCF. She went to mental health treatment and dual diagnosis programs. After initial resistance to parenting instruction, she attended parenting classes and accepted one-on-one parenting supervision. She has stayed on the medications prescribed for her mental illness, but her continued substance abuse lessens the effectiveness of those medications. On the other hand, she also rejected several important treatment recommendations made by her service providers: that she move to supervised housing after Frank Street Place instead of independent living, avoid further substance abuse, and take all scheduled drug tests. Because of her limited mental capacity, she was not able benefit from many of the programs offered to her, to learn and retain the parenting skills taught to her, or to care adequately for her children. Thus, despite her mixed efforts and her desire to regain custody of her children, she has not adjusted her conduct sufficiently so that she could assume a responsible position in their lives or care for them in a way that met their needs.
The respondent father, on the other hand, has made no effort to adjust his conduct or circumstances to make it in the best interest of the children to be united with him. He has had no contact with them and virtually none with DCF.
 (7) The extent to which a parent has been prevented from maintaining a meaningful relationship with the child by the unreasonable act or conduct of the other parent of the child or the unreasonable act of any other person or by the economic circumstances of the parent — § 17a-112 (k)(7)
Neither parent nor anyone else interfered with or prevented reunification of the other parent with these children. Economic circumstances of either parent have not prevented reunification or a meaningful relationship with their children.
C. BEST INTERESTS OF THE CHILD — § 17a-112 (j)(2)
CT Page 10956-bn
The court is next called upon to decide whether termination of the parental rights of Ms. Elizabeth G. and Mr. William B. would be in the best interests of the children.[18]
As for the respondent mother, the evidence is clear and convincing that she will never be able to care adequately for these children. Moreover, it is equally clear that the suggestion of her attorney, for DCF or DMR to place her in a residential facility that would provide 24-hour supervision for her and her children, would not be in the best interest of her children. William, Windel, and Maeka, each for his or her own reasons, all need permanence, security, and stability now in a home that will meet their needs and they need to be cared for by a parent who can nurture and sustain them through their behavioral and psychological problems into adulthood. Ms. G. cannot provide that setting and will never be able to do so. The current foster parent, Gloria F., can do so. Ms. F. has developed a close and nurturing relationship with each of these three children. Under her care, the behavioral problems of each one have improved. Contact with their mother, moreover, causes each child such great stress that their behavioral problems regress. Continuing to see her or have contact with her jeopardizes the ability of each one to overcome his or her psychological and behavioral problems. The court thus finds by clear and convincing evidence that it is the best interest of each child to terminate the parental rights of Elizabeth G.
The court also finds by clear and convincing evidence that it is in the best interest of all three children to terminate the parental rights of William B. He has had no contact with them for several years. They have no relationship with him. They need a home now that can meet their many needs. In his absence, he has prevented himself from showing whether he could ever offer such a home.
Based upon the foregoing, the court finds by clear and convincing evidence that it is in the best interest of William, Windel, and Maeka to terminate the parental rights of Elizabeth G. and William B. as to each child. The court makes this finding in consideration of the psychological and behavioral problems of each child, the exacerbation of these problems after contact with their mother, the need of each child for a secure and permanent environment that can address these problems, the secure and nurturing relationship that each one has developed with their foster parent at this time, the lack of a relationship with either biological parent, and the totality of circumstances existing in this case. CT Page 10956-bo
 IV — ORDERS OF TERMINATION
The court, having considered all the statutory criteria and having found by clear and convincing evidence that grounds exist for the termination of each respondent's parental rights and having determined, upon all of the facts and circumstances presented, that it is in the child's best interest to terminate the parental rights of each respondent parent, accordingly ORDERS:
The court hereby terminates the parental rights of Elizabeth G. and William B. as to William, Windel, and Maeka;
The court appoints the Commissioner of the Department of Children and Families as the statutory parent of each child for the purpose of securing an adoptive family or other permanent placement for them;
Within thirty days of this judgment, the Commissioner shall submit a written report addressing such permanency plan; DCF shall file such further reports as are required by state and federal law.
BY THE COURT
STEPHEN F. FRAZZINI JUDGE OF THE SUPERIOR COURT CHILD PROTECTION SESSION